THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRETT RODGERS, Defendant-Appellant.

Fifth District    No. 5—01—0324

Opinion filed November 19, 2002.

Jack Strellis, of Strellis, Faulbaum, Walsh & Field, Chtrd., of Waterloo, and Stephen C. Buser, of Law Office of Stephen C. Buser, Ltd., of Columbia, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Trent M. Marshall, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

When darkness falls over the town of East St. Louis, Illinois, and the moon glistens on the black waters of the Mississippi, a riverfront hangout known as Affirmation East comes to life. Bartenders pour drinks, "Oatmeal" Gines spins records, and patrons make merry on a strobe-lighted dance floor. People can literally stay there all night long and, if they choose, dance until dawn.

The Affirmation East boasts two things that a lot of other nightclubs scattered around East St. Louis do not offer. First of all, it

works very hard at making the club a safe place to be. Management insists upon a high level of security. Most of its patrons do not mind passing through its metal detector or complying with a routine request to search before being allowed to enter. Security is strictly enforced by a fleet of unarmed security guards. Even police officers are denied admittance if carrying a service revolver.

In addition to its reputation for providing a safe environment for patrons, Affirmation East is known for its famed fried chicken. The club features it nightly and makes sure that there is always plenty on hand to satisfy early morning appetites.

On July 25, 1999, at approximately 4 a.m., Brett Rodgers steered a drunken path to the Affirmation East, intent on satisfying a sudden hunger for its prized cuisine. Unfortunately, he arrived with more of an appetite for trouble than poultry, and when security personnel tried to block his admission, things really turned foul.

Five years earlier, Rodgers came home to East St. Louis after a stint in the Navy and a combat tour of duty in the Middle East. He went to school, graduated, and got a job fighting a different kind of enemy. He became a lawman. His patrol of East St. Louis haunts and byways brought him in contact with more than a few drunk drivers and gun-toting bullies.

July 25, 1999, was the day that Brett Rodgers' law enforcement career ended. On his trip to the Affirmation East, he traded his time in a police uniform for time in a prison jumpsuit. He lost his badge, and he lost his freedom, when, in a fit of drunken anger, he shot a security guard in the leg for trying to block his admittance. A St. Clair County jury dismissed his claim that he was too intoxicated to know what he was doing. He currently serves an eight-year prison term for driving under the influence of alcohol and committing an aggravated battery with a firearm.

Rodgers asks us to overturn his aggravated-battery-with-a-firearm conviction. He maintains that the evidence belies the jury's verdict. He wants us to overrule the trial judge's denial of a motion for a judgment of acquittal notwithstanding that verdict. The facts of the case are clear and uncontradicted.

At around 4 a.m. on the morning of July 25, 1999, Carlos Johnson and Sanchez Sylvester, two Affirmation East security guards, saw Rodgers pull up in front of the club. Rodgers got out of his vehicle and moved several orange cones that served as a barrier to parking in front of the club. The area was reserved for use only by very important patrons. Johnson and Sylvester did not think that Rodgers was so qualified. As Rodgers pulled into his newly created parking spot in front of the club, Johnson and Sylvester left their posts to inform him that his Suburban would have to be moved from the reserved area.

Rodgers had enough alcohol in his system to incapacitate most men. His blood would later test out at a .268 blood-alcohol concentration. The state of inebriation no doubt fueled a belligerent attitude over the security guards' request that he find another parking spot. Rodgers told them, "You've got to be kidding," and defiantly exited his vehicle. Johnson saw Rodgers take his service revolver from the passenger seat where it rested, reach behind himself, and tuck it down the small of his back into his pants.

Sylvester remained unaware of the fact that Rodgers was armed. He told Rodgers that he could not enter the club in tennis shoes. As Rodgers approached the club's entrance, he announced that he was an East St. Louis police officer and explained that it was a status that afforded him certain license. Even though the club might not want him to park where he did or come into the club with tennis shoes on, he could park wherever he pleased and wear whatever he wanted. As Rodgers succinctly defined the license of his office, "I can do what the fuck I want to do."

Rodgers was about to take this proclamation of authority to disobey parking restrictions and nightclub dress codes to a greater height.

As Sylvester stood between him and the door, Rodgers clenched his fists and advanced for a fight. Sylvester sent him to the ground with a right to the jaw. It is unfortunate for Johnson, and for Rodgers, that it was not a knockout punch.

Rodgers rose to renew the encounter. This time he approached with something to better his position. Service revolver in hand, he again made his way to the club's entrance. Sylvester wisely withdrew as fast as his feet would carry him. Anticipating trouble, Johnson had already run into the club. He yelled at the bartenders to summon the police and warned patrons to back away.

Rodgers entered the club, holding his revolver in a manner designed to take steady, dead aim. His arms were outstretched and both hands held the weapon. He wielded it back and forth, as he slowly walked toward Johnson. Patrons hastily parted to create a path as Rodgers trained his weapon upon Johnson and commanded Johnson to approach him. Johnson thrust his hands into the air and froze. Rodgers grabbed him, shoved him back, altered his aim, and fired a point-blank round into Johnson's left leg.

Although Rodgers was only trying to maim and not trying to kill, Johnson could easily have perished from the wound. The bullet shattered Johnson's left femur and severed the femoral artery. Johnson fell to the ground. His stirred heart pumped rapidly, and with each beat, a large gush of Johnson's lifeblood was lost.

After shooting Johnson, Rodgers spun around, gun in hand, and yelled for everyone in the club to "get down." Everyone complied. Consequently, no one saw what happened next.

As Johnson lay on the ground, trying to hold back the streams of blood flowing from his wound, he heard two more shots, followed by the exclamation, "Oh, shit!" Johnson was suddenly joined on the ground by Rodgers, who fell at Johnson's side with a gaping wound to the face. He had somehow managed to shoot himself. It is uncertain whether he did so intentionally or not.

Johnson and Rodgers were taken to the emergency room and treated. When the hospital performed blood tests on Rodgers, they revealed a blood-alcohol concentration of .268, more than three times the amount at which the law presumes physical and mental impairment.

The foregoing facts were presented through numerous witnesses and were really never placed in dispute. Although the defendant certified the affirmative defense of self-defense, he never put forth a version of events upon which to base such a defense. His brief explains why. Appellate counsel writes:

> "As a result of Dr. Ullah's expert witness testimony and opinions regarding the meaning of the Defendant's level of intoxication as it related to the Defendant's perception and judgment, the Defendant asserted the defense of voluntary intoxication, abandoned the former defense of self-defense[,] and chose not to testify in his own defense."

Dr. Sara Ullah, the physician who treated Rodgers, testified for the State. Her testimony was offered to help prove the driving-under-the-influence charge. However, the prosecutors did not limit their inquiry of Dr. Ullah to her test results and her observations of intoxication. They asked her opinion about what Rodgers' high level of blood-alcohol concentration meant in terms of his impairment. Her answer is the linchpin of Rodgers' argument that the evidence was legally insufficient to refute the defense of voluntary intoxication. He maintains that "the record is devoid of any evidence of the requisite intent" to commit the crime of aggravated battery.

The critical passage of trial testimony reads as follows:

> "Q. Okay. And a person with more than three times the legal limit, would that affect someone's ability to perceive things?
> A. Definitely.
> Q. Would it affect an individual's judgment?
> A. It will."

At the close of the State's case, defense counsel moved for an acquittal on the aggravated battery charge, arguing that the expert

testimony tendered by the State had raised the intoxication defense and established in uncontradicted fashion that Rodgers lacked the capacity to exercise judgment or perceive the significance of events. After the trial judge denied the motion, defense counsel argued the intoxication defense to the jury. Counsel told the jury that the State's own expert witness had testified that, with a .268 blood-alcohol concentration, "definitely, definitely one's judgment would be suspended." After closing arguments were completed, the jury was instructed on the voluntary intoxication defense.

No one ever questioned how the defense of voluntary intoxication could be raised to excuse guilt for a general-intent crime like aggravated battery with a firearm.[1] Given the fact that a wealth of witnesses saw Rodgers shoot Johnson in the leg while Johnson assumed a posture of surrender, it is understandable that defense counsel would want to abandon a defense that claimed the right to use deadly force in self-defense. However, the defense fashioned around Dr. Ullah's opinion about impairment was completely lacking in legal efficacy. Defense counsel was fortunate to receive a voluntary intoxication instruction, the State having registered no objection to it.

■ It is well settled that the defense of voluntary intoxication may be employed only when the offense charged requires the proof of a specific intent as one of the elements of the crime. It is not a defense to general-intent crimes. *People v. Harkey*, 69 Ill. App. 3d 94, 96, 386 N.E.2d 1151, 1153 (1979). Aggravated battery is "a crime of general, not specific, intent." *People v. Leppert*, 105 Ill. App. 3d 514, 516, 434 N.E.2d 21, 23 (1982). Thus, defense counsel argued, and the jury weighed, a theory of innocence that does not exist under the law. The trial judge's refusal to enter a judgment of acquittal based upon a nonexistent defense was decidedly correct.

Were we inclined to pay heed to counsel's continued reliance upon voluntary intoxication as a means to innocence, we would strongly disagree with the contention that the record is devoid of evidence to establish that Rodgers knew what he was doing. All of the evidence in this case supports an opposite conclusion.

We are sure that alcohol played a significant role in the commis-

---

[1]At the time of the trial, we still recognized a narrowly defined affirmative defense to criminal culpability, where voluntarily induced intoxication was so extreme to suspend the power of reason and render someone incapable of forming a specific intent that constituted an element of the particular charged offense. 720 ILCS 5/6—3 (West 1998). Effective January 1, 2002, Illinois no longer recognizes voluntary intoxication as an excuse for criminal conduct. 720 ILCS 5/6—3 (West Supp. 2001).

sion of this crime. It no doubt rested enough brain cells to remove normal inhibitions and diminish any sense of human decency, something we are certain Rodgers must possess. We would like to believe that the behavior exhibited would not have occurred if he was in a sober condition. That being said, everything that Rodgers did points to deliberate and purposeful behavior indicative of the fact that he knew what he was doing. Upon his arrival at the club, he procured a choice parking spot. He did not drive through the cones that marked the reserved parking area. He stopped his Suburban and left it running. He removed enough of the cones to provide a path for him to travel, after which he proceeded to park his vehicle. When his actions drew a confrontation with security guards, he defiantly exited his vehicle, but not before he reached for his service revolver and carefully concealed it in the small of his back. He tried to assert his station in life to pull rank over the parking restrictions and dress code. When that did not work, he showed an aggressive bent to use force in order to get his way. After being sent to the pavement by a hard right hand, he immediately armed himself for a renewed encounter. He entered the club with a posture that telegraphed everyone that he was ready for gunplay. Because Sylvester ran from sight, he singled out Johnson, the other security guard, as his prey for retaliation. When he vented his drunken anger by shooting Johnson, he did not shoot randomly. With both hands on his pistol to steady his aim, he targeted the left leg. He clearly wanted to inflict pain rather than kill. While his sodden brain certainly lacked any conscience, it still harbored the capacity to act consciously. Rodgers knew what he was doing. He knew that it was wrong. Because of the alcohol in his system, he simply did not care about the consequences.

The expert testimony that defense counsel employed merely stated an obvious truth that anyone on the jury could understand without expert opinion. The consumption of alcohol in large quantities will definitely affect a person's perception and judgment. In all probability, that is why this crime occurred. It is why a lot of crimes occur. However, it never has excused and it never will excuse shooting someone in the leg.

■ In a related argument, Rodgers asks us to grant a new trial based upon the prosecutor's improper closing argument. Since the prosecutor's remarks tried to dissuade the jury from accepting the notion that Rodgers should be acquitted because of his voluntary intoxication, Rodgers' argument on appeal must fail. While the prosecutor's closing argument may have diminished the chance of an acquittal because of intoxication, it could not possibly have prejudiced Rodgers from achieving a just result. An acquittal based upon

voluntary intoxication would have been a miscarriage of justice, the result being contrary to the law of this state.

To whatever extent a defendant is entitled to fair argument over a question of guilt or innocence that lacks legal efficacy, the prosecutor's argument was fair enough. Defense counsel argued that Dr. Ullah had concluded that Rodgers' judgment was "definitely suspended." The prosecutor rebutted with an argument that Dr. Ullah had concluded that Rodgers' judgment was "possibly suspended." Dr. Ullah did not reach either conclusion. She merely acknowledged that given the level of Rodgers' blood-alcohol concentration, his perception and judgment would definitely be affected. She also testified that many variables would enter into a measure of mental impairment. Of the two mis-statements, the State's version is closer to the message that her testimony actually conveyed. Moreover, the jurors were instructed about closing arguments, any misstatements of the evidence made during them, and their responsibility to determine what the evidence presented. No error occurred.

For the reasons stated, we affirm.

Affirmed.

WELCH and GOLDENHERSH, JJ., concur.