**Illinois Official Reports**

---

**People v. Himber, 2020 IL App (1st) 162182**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRIAN HIMBER, Defendant-Appellant. |
| District & No. | First District, Second Division<br>No. 1-16-2182 |
| Filed<br>Rehearing denied | March 17, 2020<br>May 14, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-14812; the Hon. Gregory Robert Ginex, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Alison L.S. Shah, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and Aline Dias, Assistant State's Attorneys, of counsel), for the People. |

Panel

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a jury trial, defendant was convicted of first degree murder and sentenced to 50 years' imprisonment. On appeal, defendant challenges his conviction and the sentence imposed thereon, arguing that the circuit court erred in (1) denying his request to provide the jury with an instruction on the lesser-included offense of involuntary manslaughter, (2) allowing prejudicial autopsy photographs of the victim to be published to the jury, (3) precluding him from presenting expert witness testimony, and (4) imposing an excessive sentence. For the reasons explained herein, we affirm the judgment of the circuit court.

¶ 2                                        BACKGROUND

¶ 3        On July 22, 2012, defendant, an Illinois state trooper, shot and killed his girlfriend, Tracy Mays, at a middle school graduation party. After shooting Mays, defendant shot himself. Defendant, however, survived his injuries and was subsequently charged with first degree murder.

¶ 4        At trial, Dominic Carmignani[1] testified that his parents hosted a party at their residence located at 1090 Nelson Street, in Westchester, Illinois, on July 21, 2012, to celebrate his graduation from middle school. Defendant, who was a "close friend" of his father, Scott, attended the party with his girlfriend, Tracy. Sometime around midnight, Dominic was in his living room talking with Jack Rizzi and Jeff Vitek, two of his friends, when defendant walked into the house. Dominic recalled that defendant was carrying a beer bottle and that he "was walking in a fast pace very angrily." Tracy was following him. Defendant proceeded to walk through the house and out of the front door, slamming the door and causing a vase to fall as he exited the residence. Dominic went to pick up the vase, and after doing so, he looked out of the front door window. Through the window, he observed Tracy sitting on the front porch with her phone in her hand. Dominic then looked to his left and observed defendant walking down the street in the direction of his parked car. As he was walking, defendant threw the beer bottle that he was holding, and it shattered in a neighbor's driveway.

¶ 5        At that point, Dominic walked into the kitchen and informed his father what defendant had done. He then went to speak to his mother, who was in the backyard, before he returned to the front door and resumed looking out the window. Tracy was still sitting on the front porch steps, and defendant was standing in front of her approximately four or five feet away. He also observed his father cleaning up the broken beer bottle glass in their neighbor's driveway. Dominic testified that he then turned around and began walking back to the living room to rejoin his friends. As he was doing so, he heard four gunshots being fired from the front of his

_____

[1]Dominic and his father, Scott, both testified at defendant's trial. Because they share the same last name, we will refer to both witnesses by their first names to avoid confusion about their respective testimonies.

house. Dominic immediately walked into the garage, which faced the front of the house. The garage door was open, and he observed his father holding defendant, who was "on the ground bleeding." Dominic's father instructed him to call 911, and Dominic immediately screamed for someone inside the house to call 911. When Dominic reentered the house, he saw Tracy lying on the ground in the front hallway. Although she was bleeding from her chest, she was still conscious and yelled, "call 911, I've been shot." Dominic testified that he walked to his bedroom, where he remained until law enforcement personnel and an ambulance arrived.

¶ 6        On cross-examination, Dominic testified that he had known defendant for several years prior to the shooting and that he was aware that defendant and Tracy's relationship had some "problems"; however, he admitted that defendant and Tracy had seemed happy together on the evening of his graduation party. Dominic also acknowledged that he had heard defendant and Tracy talking in the front of the house before the shots were fired; however, he was unable to hear exactly what was being said. Finally, he admitted that he did not see the shooting itself.

¶ 7        Jeffrey Vitek, a neighbor of the Carmignani family and a friend of Dominic's, testified that he attended the graduation party with several other friends. He arrived around 8 p.m. and socialized, played basketball, and ate. Around midnight, he was sitting in the house talking to several of his friends when he observed defendant, whom he had never met prior to that night, enter the house from the backyard and walk through the house toward the front door. Defendant "looked very angry" and said: "I'm going to kill that b***." Vitek stood up and peered down the hallway and observed defendant slam the front door, which caused "something" to fall off the side table located near the door. Vitek then went into the garage to see what defendant was doing because he was "being nosey." When he looked out of the open garage door, he observed defendant exit a parked truck and begin walking toward the front porch, where Tracy was sitting. He recalled that defendant began "screaming at her very loud and she was just standing there, listening, and seemed very upset." Vitek could not make out the words being said and went back inside the house. Shortly thereafter, he heard three or four gunshots. When he looked toward the front door, he saw Tracy stumble into the house and heard her say, "call 911, call 911, I got shot." Vitek testified that he began "freaking out" and hid behind the kitchen counter with Dominic's little brother, who was crying. At some point, an adult instructed the kids to go to the basement, and Vitek and the other kids relocated to the basement until police officers arrived. Vitek provided a statement to law enforcement officers that evening as well as a written statement thereafter. He also viewed a photo array at the Westchester Police Department. Defendant's picture was included in the array, and Vitek identified him as the man he observed standing in the front of the Carmignani house prior to the shooting.

¶ 8        Jack Rizzi, Dominic's "best friend[ ]," also attended the graduation party. During the party, the "kids were in the front just playing basketball and [the] parents were mostly in the back, just talking." Around midnight he was inside the house talking with Vitek when he observed defendant, who "looked pretty angry," enter the house. Defendant was "walking pretty fast" and "kind of bumped into" him as he made his way to the front door. Defendant was holding a bottle of beer and said, "I'm going to kill this fu*** b***." Rizzi testified that he "just kind of brushed it off" and "didn't really think much of" defendant's statement. Rizzi testified that, after grabbing food or a drink, he walked toward the front of the house where Dominic was standing by the front door. Dominic told him "don't go out in front," so Rizzi returned to the back of the house. He then heard three gunshots. Rizzi did not know where the shots were coming from and began trying to find a hiding place. When he "peeked" down the front

hallway, he saw Tracy. She had been shot in the neck and was bleeding. Rizzi and the other kids then went down to the basement until police officers arrived. Rizzi testified that he spoke to one of the officers and reported what he had seen. Later, he went to the Westchester Police Department with his mother, where he viewed a photo array that contained six pictures. Defendant's picture was included in that array, and Rizzi identified him as the man he had seen at the party who had walked through the Carmignanis' house and out the front door shortly before the shooting.

¶ 9    Scott Carmignani, Dominic's father, testified that "all of [his] closest friends" attended the graduation party that he and his wife hosted on July 21, 2012, including defendant, who attended the party with his girlfriend, Tracy. Scott had known defendant for "roughly five years" and considered him to be a "best friend, son-type to [him]." Defendant was also "very close" to Scott's two sons, especially his eldest son, Dominic.

¶ 10    Defendant and Tracy arrived at his son's party between 5:30 and 6 p.m. The adults, including defendant and Tracy, spent most of the party socializing in the backyard while the kids were "hanging out in the garage listening to music [and] playing basketball." At approximately 11:36 p.m., several Westchester police officers arrived at his house in response to a noise complaint. Scott and his wife spoke to the officers and lowered the music. At that point, "the party was pretty much over," as many of the guests began leaving. Some guests remained at the party after the noise complaint, however, including defendant and Tracy. Sometime around midnight, Dominic approached Scott in the backyard and told him that defendant was "very mad" and had broken a beer bottle in front of their neighbor's house. In response, Scott grabbed a garbage can and broom from the garage and went to clean the broken glass. As he was sweeping, Scott noticed Tracy sitting on his front porch and defendant standing in the middle of his front yard. Defendant and Tracy were talking, but he did not hear exactly what they were saying. Defendant then "began raising his voice and getting kind of loud." Scott approached defendant, who had begun walking away from Tracy. Scott told defendant that his kids "loved him and they didn't need to see him as worked up as he was, and he didn't need to be acting the way he was." Defendant, in turn, responded: "f*** this, f*** her. I can't take this anymore, and I'm done with this." Scott assumed that defendant was talking about Tracy. Defendant then walked away from him.

¶ 11    After defendant walked away from the house, Scott approached Tracy, who remained sitting on the front porch. He "could tell she was emotionally upset." Scott recalled that she was holding her cell phone in her hand and was "slouched over and very quiet." At that point, defendant walked up beside him. Scott turned his head to the left and saw defendant raise his right arm. Scott then heard "three shots one right after another." After the third shot, Scott realized that defendant was shooting a gun. Scott "assumed [defendant] was shooting above Tracy's head for whatever reason." He screamed at defendant asking him "what the f*** [he] was doing." Defendant began to walk away but turned around quickly and shot at Tracy one more time. Defendant again began to walk away but turned around, looked at Scott, and then "shot himself underneath the chin." Defendant remained upright for "maybe like a second" before he fell to the ground and began bleeding from underneath his chin. Scott immediately ran over to defendant and jumped on top of him. Scott held defendant's head in an effort to slow the blood flow until the police and paramedics arrived. Scott talked to police several times after the incident.

¶ 12       On cross-examination, Scott admitted that he and defendant had been drinking at the party. Scott estimated that he consumed four or five vodka cranberry drinks during the course of the evening but denied that he was "drunk" when the shooting occurred. He admitted, however, that in his grand jury testimony he stated that he might have been "slightly drunk" when he talked to detectives shortly after the shooting. Although Scott categorized defendant as "a heavy drinker," it did not appear to Scott that defendant was "drunk" at the party. He admitted, however, that he was only with defendant "sporadic[ally]" during the party because he had other guests to attend to. As a result, Scott did not know how much alcohol defendant consumed that night. He admitted, however, that defendant had a beer in his hand every time that he talked to him that evening. Scott also admitted that he never sought to help Tracy after defendant shot at her because he "didn't know she got hit." Scott explained that he thought defendant "shot into [his] front door to scare Tracy, and then shot himself" and that he did not realize that Tracy had actually been shot until later.

¶ 13       Renato Ricchio testified that he and his family attended Dominic's middle school graduation party. They arrived at the party around 7 p.m. His son, Francesco, and Dominic were "very good friends," and Ricchio and his wife were friendly with Dominic's parents. Defendant also attended the party with his girlfriend, Tracy. Ricchio had met defendant approximately three years before at another social gathering at the Carmignanis' residence. After their initial meeting, Ricchio socialized with defendant on about six or seven other occasions at events hosted by the Carmignanis. Ricchio testified that he interacted with both defendant and Tracy at Dominic's graduation party.

¶ 14       Sometime around 11 p.m., Ricchio noticed that defendant "looked upset." Approximately one hour later, Ricchio was with his family in the backyard preparing to leave the party when he "heard several gunshots that came from the front of the house." A few seconds later, several kids ran into the backyard and began yelling that "somebody had been shot." Ricchio ran into the house and through a hallway to the front of the house and observed Tracy lying on the ground. It appeared that she had been shot in her neck. Chuck Parrilli, another party guest, was tending to her and instructed Ricchio to call 911. Ricchio used his cell phone to place the call. While he was on the phone, Ricchio heard screams "coming from the garage." When Ricchio entered the garage, he saw Scott and defendant lying on the ground in the driveway. Defendant "was bleeding profusely from his face. And Scott had his hand on him and [was] just holding" defendant.

¶ 15       Shortly thereafter, Ricchio observed a police car driving down the street. Ricchio began walking down the driveway intending to speak with the officers to provide them with information. As he was passing Scott and defendant, he noticed a gun on the ground. The gun was located approximately 5 to 6 feet away from defendant. Ricchio directed the officers to the gun and returned to the house to check on Tracy. She "had not moved" and was still lying in the "same position" in the front hallway. Paramedics arrived approximately one minute later.

¶ 16       Westchester police officer Kevin Tierney testified that he was dispatched to the Carmignani residence in the early morning hours of July 22, 2012, in response to "a report of shots fired with two people possibly shot." He "responded lights and siren and arrived on scene with a few [other] officers." When he arrived at the scene, Officer Tierney observed another officer "approach what appeared to be a victim lying inside the house." The victim was a woman, and she "appeared to be lying on her back." He then observed two men lying on the

ground of the driveway. One of the men was bleeding and was lying on his back, and the other man was lying on top of him. Officer Tierney also observed a small black handgun on the ground "at the feet of the male that was bleeding." For safety purposes, Officer Tierney retrieved the gun from the ground and checked it to see whether or not there were any bullets remaining in the magazine or the chamber. He described the gun as a Ruger LCP .38 and testified that he "found that the magazine inside was empty, but there was still one round left in the chamber." Officer Tierney secured the weapon in a container located in the trunk of his squad car. When he returned to the police station, Officer Tierney inventoried the gun, magazine, and the unfired bullet in accordance with police protocol.

¶ 17    Commander Jack Bridson of the Bellwood Police Department and a member of the West Suburb Major Crimes Task Force (WESTAF) testified he was called upon to assist the Westchester Police Department investigate the shooting that occurred at the Carmignani residence on July 22, 2012. Commander Bridson was the designated "operations supervisor" whose "primary responsibility [wa]s to oversee the whole [investigative] team." When he arrived at the scene at approximately 3:30 a.m., it had already been "taped off" and secured. He then approached the front of the residence to "walk the scene." As he did so, he observed a spent bullet casing in the driveway. The driveway also contained a pillow with a red stain on it, a black T-shirt, sandals, and keys. He also observed four spent shell casings on the walkway leading to the front porch of the residence and another located near the mat by the front door. Red stains were visible on the concrete leading into the doorway and into the residence. The concrete also appeared to contain some marks "that appeared to be consistent with what we would call a bullet strike or a projectile strike on the porch." When Commander Bridson proceeded into the residence, he discovered "noticeable bloodstains" on the floor and wall of the foyer. After walking the scene, he assigned Detective Zachary Sienkiewicz, another member of his WESTAF team, to recover the bullet casings and other items of evidentiary value from the scene. Those items were then turned over to the Westchester Police Department.

¶ 18    Caryn Tucker, a forensic scientist with the Illinois State Police Division of Forensic Services and a specialist in the field of firearm and tool mark identification, received the firearms evidence collected in the case. That evidence included a semiautomatic firearm, six fired cartridge casings, two fired bullets, and several bullet fragments. After conducting tests, she confirmed that the firearm was "fully operational" with no irregularities and that the cartridge casings, bullets, and bullet fragments had been fired from the firearm. She further testified that, based on her examination of the firearm's trigger pull, seven pounds of pressure would need to be applied to discharge the weapon. Tucker explained that, because the firearm at issue was a semiautomatic rather than an automatic weapon, seven pounds of pressure would need to be applied each time to pull the trigger and discharge a bullet.

¶ 19    Dr. Adrienne Segovia, an assistant medical examiner with the Cook County Medical Examiner's Office and an expert in the field of forensic pathology, conducted Tracy's autopsy, which involved an internal and external examination of Tracy's body. The external examination revealed three "gunshot wounds of entrance" located on the left side of her body. Those wounds were found on her neck, "posterior left shoulder," and her "left, upper, outer arm." During her internal examination of the body, Dr. Segovia recovered three bullets. She recovered one bullet from the lower portion of Tracy's left lung, another in the right chest cavity, and the third from Tracy's left shoulder blade. The bullets caused multiple internal injuries, including a tear to the left basilic vein in her left upper arm, a fracture to the left

shoulder blade, and injuries to the lower portions of both lungs. Although Dr. Segovia did not assign specific trajectories to each of the bullets, she could confirm "with certainty" that the bullets recovered from Tracy's torso were "recovered from points lower than the entrances." Dr. Segovia concluded that Tracy's death was caused by multiple gunshot wounds and classified the manner of her death as a homicide.

¶ 20 Following Dr. Segovia's testimony, the State rested its case-in-chief, and defense counsel moved for a directed verdict, but the motion was denied. Thereafter, defendant elected to take the stand and testify on his own behalf.

¶ 21 Defendant testified that he and Tracy had been romantically involved for "[o]ver three years" and that he loved her and "wanted to marry her." He characterized their relationship as "happy." He and Tracy spent the day together before arriving at Dominic's graduation party at approximately 5:30 or 6 p.m. At the party, defendant and Tracy spent time socializing with other guests in the backyard, and defendant started drinking a Corona Lite. He also ate some food, including a "little bit of pasta," a "beef sandwich with giardiniera," and a "piece of cold chicken." Sometime thereafter, defendant began feeling sick. He "broke out into a sweat," "started to get a headache," and had "extreme" diarrhea. Defendant spent about 5 to 10 minutes in the bathroom before he rejoined the other guests at the party. He began drinking again and estimated that he "probably" consumed 12 beers that evening.

¶ 22 Around 9 p.m., defendant again felt sick. He was sweating and had a headache, a bad toothache, and another bout of diarrhea. Although he had intended to leave the party around 9 p.m. to go to a bar to watch a televised UFC fight, defendant remained at the party because Tracy was dancing and having a good time. Defendant stood off to the side by the fence because he still "wasn't feeling very well" when Tracy approached him with "a couple shots" of alcohol. Defendant believed that he consumed both shots. Tracy then went into the Carmignani residence to use the bathroom. Defendant noticed that she had left her cell phone on a table so he went to retrieve it. When he looked at the phone, he saw that she had received a Facebook message that said "too bad you are out with your boyfriend right now. I can't even get to second base with you." Defendant showed Tracy the message on her phone. He was not angry about the message and joked that her Facebook friend should come pick them up since they were both too intoxicated to drive. Defendant testified that he and Tracy laughed at his joke and rejoined the other guests, including his good friend, Scott,[2] who was drunk. After Scott mentioned needing more ice and cigars, defendant recalled that he walked to his car that he had parked down the street. When he did so, he remembered "dropping a bottle." Defendant then relocated his car closer to Scott's house and rejoined the party.

¶ 23 When he rejoined the party, defendant did not see Tracy in the backyard so he went in the house to look for her. Scott was in the house and began yelling at him about the broken beer bottle. Defendant remembered that he again returned to his vehicle, but that was the last thing he remembered doing that night. He did recall hearing sirens and feeling Scott lying on top of him sometime later that night. The next thing he knew, he woke up in the hospital. When he woke up, he did not know that Tracy was dead or how he had sustained his own injuries. Although defendant knows that his "secondary weapon" was used to kill Tracy, he denied knowing how Tracy was killed. He also denied that he ever intended to harm her. Defendant admitted that he was drunk at the graduation party.

_____

[2]When referring to Scott Carmignani at trial, defendant used his nickname "Scotty."

¶ 24    On cross-examination, defendant acknowledged that he had undergone firearms training during his tenure as an Illinois state trooper. As part of that training, he was instructed that it was not appropriate to "shoot to scare"; rather, he was trained to shoot to end a threat by firing at the threat's "center mass" or torso. Defendant further testified that, as a state trooper, he was required to demonstrate his proficiency with his police-issued firearm twice per year. He also had to demonstrate his proficiency to shoot his police-issued shotgun, rifle, and off-duty firearm once each year. Defendant denied that he was ever informed that it was improper to carry his off-duty firearm if he was intoxicated and admitted that he had carried his off-duty firearm in his pants pocket during the graduation party, where he consumed alcohol.

¶ 25    Following defendant's testimony, the defense rested without calling any additional witnesses, and the parties delivered closing arguments. The jury was then provided with a series of instructions. Although defense counsel requested that the jury receive an instruction on the lesser-included offense of involuntary manslaughter, the court denied the requested instruction. The jury then commenced deliberations and returned with a verdict finding defendant guilty of the offense of first degree murder. Moreover, the jury specifically found that, during the commission of the murder, defendant had personally discharged the firearm that proximately caused Tracy's death. The cause then proceeded to a sentencing hearing, where the court was presented with aggravating and mitigating evidence. After considering the evidence, the court sentenced defendant to 25 years' imprisonment for murder. Moreover, based on the jury's finding that defendant personally discharged the firearm that proximately caused Tracy's death, the court imposed an additional mandatory 25-year enhancement, for a total sentence of 50 years' imprisonment. Defendant's posttrial and postsentencing motions were denied. This appeal followed.

¶ 26                                   ANALYSIS
¶ 27                                Jury Instructions
¶ 28    On appeal, defendant first argues that the circuit court denied him a fair trial when it refused to instruct the jury on the lesser-included offense of involuntary manslaughter even though there was "some evidence" that he acted recklessly, which supported giving the instruction. He argues that the court improperly engaged in fact finding and dismissed evidence to support the denial of his requested instruction.

¶ 29    The State, in turn, responds that the court properly denied defendant's request to provide the jury with an instruction pertaining to the offense of involuntary manslaughter because there was no evidence to support giving the instruction; rather, there was "overwhelming evidence that defendant acted intentionally and knowingly" when he shot and killed Tracy.

¶ 30    "The purpose of an instruction on a lesser offense is to provide 'an important third option to a jury which, believing that the defendant is guilty of something but uncertain whether the charged offense has been proved, might otherwise convict rather than acquit the defendant of the greater offense.' " *People v. Hamilton*, 179 Ill. 2d 319, 323-24 (1997) (quoting *People v. Bryant*, 113 Ill. 2d 497, 502 (1986)). As a general rule, a criminal defendant is entitled to an instruction on a lesser-included offense where there is "*some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense." (Emphasis in original.) *People v. McDonald*, 2016 IL 118882, ¶ 25. The evidence need not be credible, and "[i]t is not the province of the trial court to weigh the evidence" and assess its credibility when deciding whether a lesser-included offense jury instruction is warranted. *Id.* A trial court's determination

that insufficient evidence exists to support the giving of a lesser-included offense jury instruction will not be disturbed absent an abuse of discretion. *People v. Eubanks*, 2019 IL 123525, ¶ 72; *McDonald*, 2016 IL 118882, ¶ 42. An abuse of discretion will only be found where the court's decision is arbitrary, fanciful, or unreasonable such that no reasonable person would agree with the court's conclusion. *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 31    The difference between first degree murder and the lesser-included offense of involuntary manslaughter is the defendant's mental state that accompanies his conduct at the time of the killing. *Eubanks*, 2019 IL 123525, ¶ 74; *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998), *abrogated on other grounds by McDonald*, 2016 IL 118882. Specifically, "[i]nvoluntary manslaughter requires a less culpable mental state than first degree murder." *DiVincenzo*, 183 Ill. 2d at 249. A person commits the offense of first degree murder when he kills another individual without lawful justification and by performing actions through which he either intended to kill or inflict great bodily harm on his victim or knew that created a strong probability of death or great bodily harm to that individual. 720 ILCS 5/9-1(a)(1), (2) (West 2012). In contrast, a person commits the offense of involuntary manslaughter where he unintentionally kills another individual by performing acts that are likely to result in death or great bodily harm of that person and he performs those actions recklessly. *Id.* § 9-3(a). Pursuant to statute,

> "[a] person is reckless or acts recklessly when [he] consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." *Id.* § 4-6.

Although not dispositive, courts called upon to determine whether a defendant acted recklessly and whether an involuntary manslaughter instruction is warranted consider various factors, including (1) the existence of a disparity in size and strength of the defendant and the victim; (2) the duration of the altercation and the severity of the victim's injuries; (3) whether the defendant employed the use of a weapon, such as a knife or a gun, to inflict the victim's injuries; (4) whether the victim sustained multiple wounds and injuries; and (5) whether the victim was defenseless. *McDonald*, 2016 IL 118882, ¶ 52. Ultimately, whether an involuntary manslaughter instruction is justified depends upon the unique facts and circumstances of each case. *DiVincenzo*, 183 Ill. 2d at 251. As a general rule, however, "an involuntary manslaughter instruction is generally not warranted where the nature of the killing, shown by either multiple wounds or the victim's defenselessness, shows that defendant did not act recklessly." *Id.*

¶ 32    In this case, defendant submits that Scott's trial testimony provided the requisite evidentiary support to justify an involuntary manslaughter instruction. At trial, Scott testified that he was facing Tracy, who was sitting on his front porch, when defendant walked up beside him. When Scott turned his head, he noticed that defendant had raised his right arm. Scott then recalled hearing multiple gunshots. He testified that he "assumed" that defendant "was shooting above Tracy's head for whatever reason" and that he did not realize that defendant had actually shot her until after police and medical personnel arrived at the scene.

¶ 33    Upon review, we disagree that Scott's testimony provided the evidence necessary to warrant an involuntary manslaughter instruction. Put simply, Scott's testimony about defendant's mental state and intent at the time of the shooting was, by his own admission, based on assumption and speculation, not evidence. Illinois law is clear that "[a]dmissible

testimony is limited to matters of which the witness has personal knowledge through his own senses " (*People v. French*, 2017 IL App (1st) 141815, ¶ 68 (citing *People v. Enis*, 139 Ill. 2d 264, 294-95 (1990))) and that "a witness may only testify to *facts* within his own personal knowledge and recollection, and may not draw inferences and conclusions" (emphasis added) (*People v. Hobley*, 159 Ill. 2d 272, 310 (1994)). As such, Illinois courts have routinely rejected reliance on assumptions and speculation. See, *e.g.*, *People v. Smith*, 141 Ill. 2d 40, 57 (1990) (recognizing that, although it is entirely proper for the State to prove a defendant's motive to commit a crime, it is insufficient for the State to "produce evidence of motive in the abstract," *i.e.*, speculative evidence, to establish a defendant's criminal motivation); *People v. Day*, 2011 IL App (2d) 091358, ¶ 41 (stating that a defendant's intent cannot be proven by conjecture or speculation); *People v. Patel*, 2013 IL App (4th) 121111, ¶ 66 (finding that the State failed to prove the defendant's guilt beyond a reasonable doubt when its case relied on assumptions made by an investigating officer).

¶ 34    We reiterate that Scott testified that he was standing in front of Tracy when defendant came up behind him to the side of his left shoulder. Scott then looked to his left and behind him and saw defendant's face. He then observed defendant raise his right shoulder and arm. Scott heard three shots and only then realized that defendant was shooting a gun and screamed, "what the f*** are you doing?"

¶ 35    Scott did *not* testify that he observed defendant holding, aiming, or actually discharging the gun. Moreover, he did not observe the angle of the weapon relative to Tracy as she sat on the porch steps; rather, Scott's only testimony in this regard was that he "assumed [defendant] was shooting above Tracy's head for whatever reason." This assumption is not based on any of his personal observations and is not supported by the evidence contained in the record. Furthermore, on cross-examination, when asked whether he had "indicated" on direct examination that defendant had been "shooting above [Tracy's] head," Scott's reply was "[i]n my head, that's what I thought." Later in the cross-examination, Scott added the factually baseless conclusion that, after hearing the gunshots and then witnessing defendant shoot himself in the chin, he only "thought [defendant] shot into [the] front door to scare Tracy and then shot himself."

¶ 36    Scott's assumptions and thought process did not satisfy the requisite evidentiary threshold necessary to justify a jury instruction on the lesser-included offense of involuntary manslaughter in this case. The circuit court's review of Scott's testimony in this regard was accurate, inasmuch as his assumptions were quintessentially speculative.[3]

¶ 37    Indeed, the actual evidence that is contained in the record about defendant's conduct does not substantiate his claim that he acted recklessly, such that he was entitled to an involuntary manslaughter instruction. Notably, shortly before the shooting, Dominic, Jeffrey Vitek, and Jack Rizzi observed defendant walking through the Carmignani residence in a manner the

---

[3]Although defendant argues that the circuit court improperly weighed the evidence and made credibility determinations regarding Scott's testimony when it denied his request for an involuntary manslaughter instruction, we find that a fair reading of the record does not support defendant's categorization of the court's conduct or the rationale behind its ruling. Based on this court's examination of the record, we find that the court's denial of defendant's request for an involuntary manslaughter instruction was simply based on its review of the evidence and not any weighing of the evidence.

witnesses described as "angry" and slamming the front door. In addition, Vitek and Rizzi testified that they both heard defendant state that he was "going to kill" that "b***." Defendant's own words thus belie his suggestion that his subsequent actions were reckless; rather, his words show that he acted with intent. See, *e.g.*, *People v. Rodgers*, 254 Ill. App. 3d 148, 153-54 (1993) (finding that the defendant was not entitled to an involuntary manslaughter instruction based in part on the fact that he had threatened to kill the victim prior to beating him to death, because the defendant's threats "preclude[d] a finding of recklessness"), *vacated on other grounds*, 156 Ill. 2d 564 (1994), *readopted in pertinent part*, 265 Ill. App. 3d 1 (1994). Defendant's actions, in addition to his words, also precluded a finding that his conduct was merely reckless. Shortly after vocalizing his intent to "kill" Tracy, defendant, who had to establish his firearm proficiency on a regular basis as a condition of his employment as an Illinois state trooper, used his semiautomatic off-duty firearm to shoot her three times, striking her in her neck, left shoulder, and left arm, exerting seven pounds of pressure each time that he discharged the weapon. At the time that Tracy was shot, she was sitting unarmed on the Carmignanis' porch steps. Although defendant testified that he did not remember the shooting and expressly denied that he ever intended to hurt Tracy, this court has previously recognized that

> " 'when the defendant intends to fire a gun, points it in the general direction of his or her intended victim, and shoots, such conduct is not merely reckless and does not warrant an involuntary-manslaughter instruction, regardless of the defendant's assertion that he or she did not intend to kill anyone.' " *People v. Sipp*, 378 Ill. App. 3d 157, 164 (2007) (quoting *People v. Jackson*, 372 Ill. App. 3d 605, 613-14 (2007)).

¶ 38        Ultimately, based on our review of the record as well as the relevant factors, we find that the record lacks evidence to support defendant's assertion that he acted recklessly and was entitled to an involuntary manslaughter instruction. Therefore, the court did not err in denying the requested instruction. In so finding, we disagree that this court's prior decision in *People v. Hines*, 31 Ill. App. 3d 295 (1975), compels a different result. Initially, we note that *Hines* predates our more recent decision in *Sipp* wherein we recognized that the act of shooting a gun in the direction of another person cannot be viewed as mere reckless conduct. Moreover, *Hines* is factually distinguishable from the case at bar. In *Hines*, the defendant fired three shots in the direction of the victim following a physical confrontation and expressly testified at trial that he had fired those shots simply to "scare" his victim. The defendant's request for an involuntary manslaughter instruction was denied, a ruling this court found to be erroneous on appeal. Citing the defendant's trial testimony, this court found that the jury could have believed that he had not actually intended to shoot the victim and that his discharge of the firearm in an effort to scare his victim was evidence of reckless conduct, warranting an involuntary manslaughter instruction. *Id.* at 301-02. In doing so, we reasoned:

> "It has been held that pointing a loaded pistol at another is such a gross deviation from the standard of care which a reasonable person would exercise that it constitutes recklessness. [Citation.] Surely, then, the firing of a pistol at an individual in an attempt to 'scare' him is also recklessness." *Id.* at 302.

As set forth above, not only does *Hines* fail to accord with more recent case law, but we note that, unlike the defendant in *Hines*, defendant never claimed that he discharged his firearm in an effort to scare his victim. Instead, defendant testified that he did not remember the shooting. Neither defendant's testimony nor his actions support the conclusion that his conduct in

shooting Tracy, who was seated and unarmed, three times amounted to mere reckless conduct. Accordingly, we find no abuse of discretion in the circuit court's denial of defendant's request to instruct the jury on the lesser-included offense of involuntary manslaughter.

¶ 39                                    Autopsy Photographs

¶ 40        Next, defendant argues that the circuit court "erred in allowing prejudicial autopsy photos to be published to the jury." He argues that Tracy's cause of death was not in dispute and, as such, the "grisly" autopsy photos that depicted her injuries "had no probative value and were irrelevant to any issue before the jury." He further argues that the State "capitalized" on the court's purported erroneous evidentiary ruling by including the photographs in a PowerPoint presentation during its closing argument, which effectively deprived him of his right to a fair trial.

¶ 41        The State responds that the circuit court "properly admitted the autopsy photographs where they were relevant to the issue of whether defendant intended to kill Tracy when he fired his weapon and the photos assisted with the medical examiner's testimony." Moreover, because the photographs were properly admitted, the State contends that its use of the pictures during closing argument was likewise proper.

¶ 42        As a threshold matter, we find that defendant has failed to properly preserve this issue for appellate review. Although he objected to the admission of the autopsy photographs at trial, he failed to specifically challenge the admission of the photos in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (recognizing that, to properly preserve an issue for appeal, a defendant must object to the purported error at trial and specify the error in a posttrial motion and that his failure to satisfy both requirements results in forfeiture of appellate review of his claim). Defendant's posttrial motion simply contained a generic contention of error that the "Court erred in sustaining objections made by the State and overruling objections made by the defense" but failed to identify with specificity the evidentiary rulings that he sought to challenge. This general objection to the circuit court's evidentiary rulings was insufficient to preserve for appellate review his contention of error concerning the admission of the autopsy photographs. See *People v. Johnson*, 385 Ill. App. 3d 585, 595-96 (2008) (recognizing that " 'defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve an alleged error for review' " (quoting *People v. Woods*, 214 Ill. 2d 455, 470 (2005))).

¶ 43        In an effort to avoid forfeiture, however, defendant invokes the plain error doctrine, which provides a limited exception to the forfeiture rule and allows for review of forfeited issues on appeal if the evidence is closely balanced or the error is of such a serious magnitude that it affected the integrity of the judicial process and deprived the defendant of his right to a fair trial. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *People v. Belknap*, 2014 IL 117094, ¶ 48; *People v. Sargent*, 239 Ill. 2d 166, 189 (2010); *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). The first step in any plain error analysis is to determine whether any error actually occurred. *Piatkowski*, 225 Ill. 2d at 565; *People v. Rinehart*, 2012 IL 111719, ¶ 15. If an error is discovered, defendant then bears the burden of persuasion to show that the error prejudiced him. *Sargent*, 239 Ill. 2d at 189-90. Keeping this standard in mind, we turn now to evaluate the merit of defendant's claim.

¶ 44        The determination as to the relevance and admissibility of evidence is left to the discretion of the circuit court. *People v. Brown*, 172 Ill. 2d 1, 40-41 (1996); *People v. Tatum*, 2019 IL

- 12 -

App (1st) 162403, ¶ 110. Accordingly, a court's decision to admit relevant evidence, including photographs of a deceased victim, will not be disturbed absent an abuse of that discretion. *Brown*, 172 Ill. 2d at 40-41; *Tatum*, 2019 IL App (1st) 162403, ¶ 110. "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *Tatum*, 2019 IL App (1st) 162403, ¶ 111 (quoting Ill. R. Evid. 401 (eff. Jan. 1, 2011)). If photographs of a crime victim are relevant, they are admissible and may be shown to a jury unless the prejudicial nature of those photographs outweighs their probative value. *People v. Chapman*, 194 Ill. 2d 186, 219 (2000). Courts have recognized various "valid reasons" for admitting photographs of a deceased victim, including using the photographs to prove the nature and extent of the victim's injuries and the force employed to inflict those injuries; establish the position, condition, and location of the victim's body and the manner of death; corroborate a defendant's confession; or aid the fact-finder in understanding the testimony of a pathologist or other witness. *Id.* at 220; see also *Brown*, 172 Ill. 2d at 41. Even where the photographs are cumulative of other evidence, they are admissible, particularly where they aid in the understanding of witness testimony. *People v. Heard*, 187 Ill. 2d 36, 77 (1999).

¶ 45        In this case, Tracy's autopsy photographs were admitted into evidence during Dr. Segovia's testimony when she detailed the nature and extent of Tracy's injuries and her cause of death. Moreover, based on the nature and location of Tracy's injuries, Dr. Segovia was able to testify "with certainty" that the bullets recovered from Tracy's torso were "recovered from points lower than the entrances," which supported the State's theory that defendant acted with intent when he stood in front of Tracy, who was sitting on the porch, and discharged his firearm in a downward direction, striking her three times. Courts have repeatedly recognized that the admission of photographs of a decedent to aid the testimony of a witness, including a medical examiner, is "valid" and appropriate. *Chapman*, 194 Ill. 2d at 220; *Tatum*, 2019 IL App (1st) 162403, ¶ 111. Although defendant categorizes the photographs as particularly "grisly" and "inflammatory," this court's review of the photographs reveals them to be relatively clinical and sterile. Moreover, while defendant suggests that the photographs were not relevant because he did not dispute the cause or manner of Tracy's death, only his mental state at the time of her killing, this court has previously held that "[t]he State is allowed to prove every element of the charged offense and every relevant fact, 'even though the defendant fails to contest an issue or is willing to stipulate to a fact.' " *Tatum*, 2019 IL App (1st) 162403, ¶ 113 (quoting *People v. Bounds*, 171 Ill. 2d 1, 46 (1995)). As such, "the State may offer evidence," including photographic evidence "that tends to prove any fact it needs to prove, such as the cause or manner of death, even if that fact is not disputed." *Id.* In this case, not only did the autopsy photographs aid the State in identifying Tracy's cause of death, but the photos were also used by the State to rebut the defense theory that defendant simply recklessly discharged his firearm in Tracy's general direction and did not intentionally shoot to kill her by establishing the probable trajectory of the bullets based on the location of Tracy's injuries. Therefore, we conclude that the circuit court did not abuse its discretion in admitting the photographs into evidence. We further find that the State's use of the photographs during closing argument was likewise proper. The photographs were used to support the State's argument that it had satisfied its burden of proving each of the requisite elements to sustain a conviction against defendant for first degree murder. "Having found no error, there can be no plain error." *People v.*

*Bannister*, 232 Ill. 2d 52, 79 (2008).

¶ 46                                    Expert Testimony

¶ 47     Next, defendant argues that the circuit court deprived him of his constitutional right to present a complete defense when it barred him from presenting expert testimony that he could not recall the shooting due to an alcohol-related blackout.

¶ 48     The State responds that the circuit court properly precluded defendant from presenting expert testimony about the likelihood that he experienced an alcohol-related blackout at the time of the shooting because voluntary intoxication is not a cognizable defense in Illinois and cannot be used to negate evidence that a defendant acted intentionally.

¶ 49     "A criminal defendant's right to due process and a fundamentally fair trial includes the right to present witnesses on his or her own behalf," including, when appropriate, expert witnesses. *People v. Lerma*, 2016 IL 118496, ¶ 23. As a general rule, " 'an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion.' " *Id.* (quoting *Enis*, 139 Ill. 2d at 288). When called upon to consider the admissibility of expert testimony, it is incumbent upon the circuit court to balance the probative value of the evidence against its prejudicial effect and to carefully consider the relevance and necessity of the testimony in light of the particular facts of the case. *Id.* As set forth above, evidence is considered to be relevant where it tends to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence. *People v. Illgen*, 145 Ill. 2d 353, 365-66 (1991); *Tatum*, 2019 IL App (1st) 162403, ¶ 111. Where, as here, "a party claims he was denied his constitutional right to present a complete defense due to improper evidentiary rulings, the standard of review is abuse of discretion." *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133.

¶ 50     Prior to trial, defendant, at his attorney's request, was examined by Dr. Lisa Rone, an assistant professor of clinical psychiatry and behavioral sciences at Northwestern University. Dr. Rone met with defendant on two occasions and authored a letter detailing her opinion as to why defendant was unable to recall the shooting itself even though he was able to clearly recall other events that transpired at the party prior to the time of the shooting. Based on her clinical examination of defendant, Dr. Rone opined that defendant "was in an alcohol induced blackout at the time the shooting(s) occurred. His persistent amnesia for the firing of his weapon is consistent with a blackout." Dr. Rone further opined that defendant's "memory deficit" was "consistent with an *en bloc* blackout," which prevents an individual "from remembering anything once his or her blood alcohol level reaches the point where the alcohol impairs brain hippocampal pyramidal cell activity until the level drops below the point where those cells begin to fire again." In her opinion, defendant likely experienced an "*en bloc* alcohol-induced blackout for the period immediately preceding the shooting of Tracy Mays and lasting until hours later July 22, 2012."

¶ 51     After receiving a copy of Dr. Rone's opinion, the State filed a motion *in limine* to preclude defendant from calling Dr. Rone to testify, alleging that her testimony was not relevant because voluntary intoxication is no longer a cognizable defense to criminal conduct in Illinois. In its motion, the State further argued that, although Dr. Rone offered an opinion as to the reason behind defendant's purported memory lapse of the actual shooting, she "never state[d] in her report, or even remotely suggest[ed] in her report, that the alleged alcohol-induced blackout

- 14 -

would have prevented the defendant from forming the requisite mental state to commit the crime." Given that Dr. Rone's opinion lacked any relevance to the dispositive issue as to defendant's intent to commit the crime at issue, the State argued that her testimony should be barred.

¶ 52     The court initially reserved ruling on the State's motion, finding that it was premature because it was unclear if defendant would elect to testify or what his testimony would entail. When the issue was raised again prior to trial, the court ruled that, because voluntary intoxication was not a defense to criminal conduct, Dr. Rone would be precluded from testifying and offering any opinion about defendant's alcohol consumption unless the defendant presented evidence of involuntary intoxication. Thereafter, at trial, defendant testified that he voluntarily consumed alcohol during the hours preceding the shooting and that he could remember many of the events preceding the shooting, but not the shooting itself. Defendant also testified that, shortly after the shooting, he recalled hearing sirens and feeling Scott lying on top of him. Finally, defendant testified that he had a history of drinking heavily and of blacking out as a result of alcohol consumption. The State, however, objected to defendant's testimony that he had experienced alcohol-induced blackouts in the past, arguing that his past conduct was not relevant. The circuit court agreed, reasoning that the jury heard evidence that defendant was drinking the night of the shooting and that he "didn't remember a very specific time period" and that there was no "legitimate basis *** to go into anything that happened in the past." Accordingly, the court struck defendant's testimony that he had previously experienced alcohol-related blackouts.

¶ 53     On review, we find that the circuit court did not abuse its discretion by excluding Dr. Rone's testimony. The relevant issue at trial was defendant's mental state and whether he acted intentionally or recklessly when he shot Tracy. Although Dr. Rone opined that defendant's alcohol consumption explained his purported failure to recall the actual shooting, she never offered any opinion as to the effect of defendant's alcohol consumption on his mental state. Given that Dr. Rone never offered any relevant opinion as to the dispositive issue of defendant's intent or lack thereof at the time of the shooting, we are unable to conclude that the circuit court's decision to bar her testimony constituted an abuse of discretion. In so finding, we acknowledge that the State categorized defendant's memory lapse as "convenient" during oral argument; however, defendant raised no objection to the State's categorization at trial, and we do not find that the categorization violated his right to a fair trial.

¶ 54     Moreover, we note that, at oral argument before this court, defendant conceded that his blackouts from voluntary intoxication were not relevant to intent. Given the circuit court's ruminations and the lack of clarity in defendant's brief, we nonetheless confirm that defendant's voluntary intoxication, and alleged blackout, could not impact his intent under Illinois law.

¶ 55     Prior to 2002, voluntary intoxication was a defense against criminal conduct in Illinois. *People v. Jackson*, 362 Ill. App. 3d 1196, 1201 (2006). The statute, at that time, provided as follows:

> "A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition either:
>
>      (a) Is so extreme as to suspend the power of reason and render him incapable of forming a specific intent which is an element of the offense; or

(b) Is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 720 ILCS 5/6-3 (West 2000).

See also *People v. Ehrich*, 165 Ill. App. 3d 1060, 1067 (1988) (stating that "[v]oluntary intoxication which negates the existence of a mental state which is an element of a crime is an affirmative defense"). In 2002, however, the legislature amended the statute, which currently provides as follows: "A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is *involuntarily* produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Emphasis added.) 720 ILCS 5/6-3 (West 2012). Several reviewing courts have recognized that, following this amendment, voluntary intoxication cannot be asserted as an affirmative defense to negate the element of intent. See, *e.g.*, *Jackson*, 362 Ill. App. 3d at 1201 ("Effective January 1, 2002, Illinois no longer recognized voluntary intoxication as an excuse for criminal conduct."); *People v. Rodgers*, 335 Ill. App. 3d 429, 433 n.1 (2002) ("Illinois no longer recognizes voluntary intoxication as an excuse for criminal conduct"). But see *People v. Slabon*, 2018 IL App (1st) 150149, ¶ 33 (finding that a defendant's voluntary intoxication could still be relevant to specific intent crimes notwithstanding the 2002 amendment eliminating voluntary intoxication as an affirmative defense). Given that defendant never suggested that his intoxication on the night of the shooting was involuntary and that voluntary intoxication is no longer an affirmative defense in Illinois, it necessarily follows that the circuit court properly found that expert testimony concerning defendant's voluntary alcohol consumption and his mental state was irrelevant. Moreover, we emphasize that, even assuming defendant's voluntary intoxication could negate his intent as a legal matter, Dr. Rone never offered any opinion regarding the effect of his alcohol consumption on his mental state. Therefore, the circuit court did not abuse its discretion or violate defendant's right to present a complete defense by barring Dr. Rone's testimony.

¶ 56                                              Sentence

¶ 57    Finally, defendant challenges the propriety of his 50-year sentence. He argues that the sentence imposed upon him by the circuit court is excessive given that he "had been a productive member of society prior to the shooting and where he showed the ultimate remorse in trying to commit suicide."

¶ 58    The State responds that defendant's 50-year sentence is proper "[i]n light of circumstances and nature of t[he] offense as well as the fact that the trial court considered all factors in aggravation and mitigation." As such, the State submits that defendant's sentence should be affirmed.

¶ 59    The Illinois Constitution requires a trial court to impose a sentence that achieves a balance between the seriousness of the offense and the defendant's rehabilitative potential. Ill. Const. 1970, art. I, § 11; *People v. Lee*, 379 Ill. App. 3d 533, 539 (2008). To find the proper balance, the trial court must consider a number of aggravating and mitigating factors, including "the nature and circumstances of the crime, the defendant's conduct in the commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education." *People v. Maldonado*, 240 Ill. App. 3d 470, 485-86 (1992). The circuit court is not required to explicitly analyze each relevant factor or articulate the basis for the sentence imposed, and

- 16 -

when mitigating evidence is presented before the trial court, it is presumed that the court considered that evidence in imposing the defendant's sentence. *People v. Averett*, 381 Ill. App. 3d 1001, 1021 (2008); *People v. Ramos*, 353 Ill. App. 3d 133, 137 (2004). Because the circuit court is in the best position to weigh the relevant factors, the sentence that it imposes is entitled to great deference and will not be disturbed on appeal absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000); *Lee*, 379 Ill. App. 3d at 539. As such, when reviewing a defendant's sentence, this court may not substitute its judgment for the trial court's merely because it could or would have weighed the factors differently. *People v. Jones*, 376 Ill. App. 3d 372, 394 (2007). Ultimately, when a sentence falls within the applicable statutory guidelines, it is presumed to be proper and will not be disturbed absent an affirmative showing that the sentence is at variance with the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense. *People v. Gutierrez*, 402 Ill. App. 3d 866, 900 (2010); *Ramos*, 353 Ill. App. 3d at 137.

¶ 60        Defendant was convicted of first degree murder and was thus subject to a prison term of "not less than 20 years and not more than 60 years." 730 ILCS 5/5-4.5-20(a) (West 2012). Moreover, because the jury found that defendant had personally discharged a firearm that proximately caused Tracy's death, he was also subject to a mandatory 25-year sentencing enhancement. *Id.* § 5-8-1(a)(1)(d)(iii). Therefore, the minimum sentence that defendant could have received was 45 years' imprisonment. There is thus no dispute that the 50-year sentence that the circuit court elected to impose upon him falls within the lower end of the applicable statutory sentencing range and is afforded a presumption of propriety. *Gutierrez*, 402 Ill. App. 3d at 900; *Ramos*, 353 Ill. App. 3d at 137.

¶ 61        Defendant, however, suggests that his sentence is excessive considering the significant mitigating evidence in his case. Specifically, defendant notes that, prior to the shooting, he had no criminal record; rather, he was "a productive member of society" who was employed as an Illinois state trooper. Moreover, he highlights his suicide attempt, which he now categorizes as "the ultimate showing of remorse" for shooting the woman he loved and intended to marry, as a justification for a reduction in his sentence. We disagree. In doing so, we emphasize that the record contains significant aggravating evidence including the fact that defendant employed his firearm training to shoot Tracy, who was unarmed, three times at a party where children were present. Moreover, the record shows that the circuit court carefully considered and balanced the significant aggravating and mitigating evidence presented at the sentencing hearing prior to imposing defendant's sentence. In denying defendant's motion to reconsider his sentence, the court noted that it was "a very difficult situation" but concluded that neither defendant's background as a law enforcement officer nor any apparent regret about his actions justified a reduction in his sentence. Ultimately, after reviewing the record, we find that defendant has failed to rebut the presumption of propriety afforded to his sentence and has failed to establish that the circuit court abused its discretion and imposed an excessive sentence. Therefore, we affirm defendant's 50-year sentence.

¶ 62                                             CONCLUSION

¶ 63        The judgment of the circuit court is affirmed.

¶ 64        Affirmed.