FIRST DIVISION

November 13, 2001

No. 1-99-4176

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the 

) Circuit Court of 

Plaintiff-Appellee, ) Cook County

)

v. ) No. 98 CR 26003

) 

FABIAN EASON, ) The Honorable

) Daniel J. Kelley,

Defendant-Appellant. ) Judge Presiding. 

JUSTICE COUSINS delivered the opinion of the court:

Defendant-appellant, Fabian Eason, was convicted of first degree murder for the shooting death of Lakesha Walker.  He was sentenced to 45 years' imprisonment.  The issues upon appeal are:  (1) whether the court properly denied defendant's request for a second degree murder instruction; and (2) whether the court properly denied defendant's request for an involuntary manslaughter instruction.  

BACKGROUND

Before the jury was selected for defendant's trial, the State moved to nol-pros Counts III, IV, and V against defendant.  The State proceeded on the first degree charges provided in Counts I and II only.

At trial, the State published defendant's written statement, which was taken on September 5, 1998.  Defendant's mother was present while defendant's written statement was taken.  That written statement provided the following account of events.  On the morning of September 4, 1998, defendant went to Lincoln Park High School, where he was a sophomore.  He was wearing a red and blue striped shirt and black pants.  He brought an automatic handgun with him to school.  The gun was black and contained seven rounds.  The gun had been hidden outside his house. 

When defendant left school that day, he was with Michael Jones, Aaron Frelix, Grayland Holmes, and Sedrick Pace.  Defendant is a member of the P-Stones gang.  As defendant and his friends walked on the east side of Larrabee, a group of Gangster Disciple gang members (G.D.s) were walking on the west side of the street.  Defendant saw approximately nine G.D.s and five girls walking behind them.  The G.D.s were "flashing their gang signs" and yelling "Stone killer," which is a term of disrespect to defendant's gang.  Defendant did not see any guns, knives, or any other weapons with any of the G.D.s or the girls.  The G.D.s were "throwing up the 'forks'" and "throwing down" defendant's gang sign.  

Defendant's statement to police further provided:  

   "Fabian states when they reached Blackhawk, he started to walk east.  Fabian states he then turned around and ran back to the corner.  Fabian states he then pulled out the gun.  Fabian states he pointed the gun at the group and then fired seven (7) shots.  Fabian states when he started firing, the group started running.  Fabian states after he fired the gun, he put it back into his pocket and ran."  

Defendant ran to his apartment, changed his clothes, and left the apartment.  He left the clothes that he wore to school on the floor in his room.  He put the gun in his right pocket.

Outside, someone told defendant that the police were looking for him.  He went to the Laundromat for about five minutes.  Defendant then saw his mother and police officers standing outside.  Defendant went to "Sunshine's" house.  While at Sunshine's house, defendant spoke to Dennis Booth on the telephone.  Booth picked up defendant on Hudson Street and drove him to Clybourn and Diversey.  Defendant threw the gun into the river. 

At trial, 
Theresa Simmons testified that she and Lakesha Walker, the victim, were walking north on Larrabee Street with a group that included five or six boys and three girls.  She saw defendant walking in the same direction on the opposite side of the street with a group that included four boys.  Theresa testified that the two groups were walking from school on opposite sides of the street for 20 to 25 minutes before the shooting occurred.  She noted that the boys walking with her were "throwing up" gang signs and
 demonstrating their gang affiliation.  She could see defendant in the other group across the street "until he cut, like out up between Orchard and then cut back through the alley."  When he reappeared, Theresa saw defendant pull out a gun.  When defendant pulled the gun out, the rest of his group "sort of walked off" except for the "dark skinned boy."  She and the victim began running.  Theresa heard six or seven shots fired.  

On cross-examination, Theresa stated that the five or six boys that she was walking with starting making comments to the boys across the street "saying they should beat them punk niggers."  She stated that the boys with her were not making hand gestures or "throwing up the gang sign, nothing like that.  They was just talking."  Contrary to her direct examination testimony, Simmons testified that neither group of boys represented their gangs or used gang words. 

Tasha Simmons testified that on September 4, 1998, at about 3:15 p.m.,
 she and a friend were walking north on the west side of Larrabee near Near North High School.  The west side of Larrabee is G.D. territory.  As they walked, four boys and seven girls, including the victim, were walking toward them.  The victim is Tasha Simmons' cousin.
  Tasha came within 12 to 15 feet of the group walking toward her.  Defendant was on the other side of Larrabee, standing on the corner across the street.  Tasha saw him "throwing down the fork."  The "fork" is the G.D.s gang sign and "throwing it down" means "G.D. killer."  After defendant threw down the fork two or three times, he pulled out a black gun from his right side and pointed it toward the group that the victim was walking in.  Tasha did not see anyone else with a gun.
  The groups started running.  Tasha saw somebody fall as she ran.  She saw the victim's group for four or five minutes before she heard shots fired.  During this time, she never heard the G.D.s say anything to the people across the street. Sedrick Pace testified that on September 4, 1998, at about 3:15 p.m., he was walking home from school with three classmates, including defendant.  They were walking on Orchard toward Larrabee.  He saw about nine people across the street.  Once Pace and his friends reached the corner of Blackhawk and Larrabee, defendant went into the street about 8 to 10 feet.  Pace then saw defendant argue for a while and then he "[d]ropped the fork."  The boys on the other side started to walk over, but they never walked into the street.  Defendant pulled out a black gun from his right pocket and fired six or seven times.  The people on the other side of the street scattered.  Sedrick did not see a weapon in anyone else's hands.  
On cross-examination, Pace testified that the other group "threw down a five," which meant disrespect to defendant's gang.  He also heard someone say to defendant and his friends, "We are going to beat your ass."  Pace heard one of the girls with the G.D.s across the street say, "[I]t is only a couple of them, why don't y'all go over there and beat them up?" 

Detective Brian Killacky testified that on September 4, 1998, at approximately 3:50 p.m., he received a call indicating that a girl had been shot on the property of Near North High School.  Killacky proceeded to the hospital and spoke to the physician attending to the victim.  The doctor informed the detective that the victim died from the gunshot wound.  Killacky then went to the intersection of Blackhawk and Larrabee.  At the scene, he observed six bullet casings lying on the ground, which indicated to him that six shots had been fired from a semi-automatic gun.  At the station, Killacky interviewed several witnesses to the shooting.  Theresa Simmons was interviewed and she identified defendant as the shooter. 

Melissa Rapoza testified that she was traveling westbound on Blackhawk at about 3:30 p.m. on September 4, 1998.  She stated that as she attempted to turn down an alley she "heard two pops" coming from the west that she thought to be gunfire.  As she slowed her vehicle, she "saw a young man walking, eventually running with his arm pointing west" in front of her car.  Rapoza immediately stopped.  She noticed "like a sulfur smell" in the air.  She saw a handgun in the young man's hand.  She could see his face.  Rapoza saw him put the gun into the right front pocket of his pants.  She recalled that he was wearing dark pants, navy to black in color, and he was wearing a shirt with wide, horizontal red and dark stripes.  Days after the incident, Rapoza identified the photograph of the young man she saw with the handgun.  In court, Rapoza identified defendant as the person that she saw holding the handgun.  

Officer Loren Stenson testified for the State that on September 4, 1998, while working as a plainclothes patrolman in the Cabrini Green area, at approximately 3:15 p.m., he heard gunfire coming from the 1500 block of North Larrabee.  Stenson and two other officers proceeded in the direction of the shots.  As they were driving, they saw a teenage African-American female who was crying and breathing hard.  The girl told the officers that her friend had just been shot and that "Fabian had shot her."  He went to defendant's residence.  Debra Eason's fiancé, Stanley Thomas, answered the door.  He indicated to the officers that defendant was not home.  The officers retrieved a red and black striped shirt, black jeans, and defendant's school identification card.

Detective Lawrence Aikin testified that, pursuant to the investigation of the shooting, he interviewed Michael Jones.  At about 4:30 p.m. on September 5, 1998, defendant was brought into the Area 3 Violent Crimes office.  Detective Aikin testified that defendant was placed in a lineup room, but did not participate in a lineup.  Defendant was not in handcuffs.  Aikin stated that because defendant was 16 years old, defendant's mother was contacted.  Defendant's mother arrived at about 5:15 p.m.  While at the station, defendant gave a written statement of his involvement in the presence of his mother and an assistant State's Attorney. 

Debra Eason testified on behalf of the defendant.  On September 4, 1998, Ms. Eason saw her son, the defendant, in the courtyard of her apartment complex with his friend Michael.  Ms. Eason went to a local convenience store and the Laundromat.  When she returned home, she learned that the police were looking for her son.  Defendant was not in their apartment, so the officers  searched for him in the apartments that he was known to visit.  Ms. Eason was not able to find her son that evening.  The following day, on September 5, 1998, she received a phone call from the police station indicating that they arrested defendant.  Ms. Eason went to the police station.  Eventually, an officer brought defendant into the same room as Ms. Eason.

Ms. Eason testified that she knew that at some time her son belonged to the Blackstone street gang.  She never saw defendant with a gun in September 1998.  Ms. Eason recalled that during police questioning, defendant said that the other group was "trying to kill him and he wasn't trying to kill nobody."  She was aware that defendant had trouble with the G.D.s previously.  She testified that the G.D.s shot at defendant on the first day of school and a few days after that, but she did not report the incidents to the police "because they didn't care."

The State presented the testimony of Officer Marie Murphy in rebuttal.  Officer Murphy testified that on September 5, 1998, she was present during the questioning of defendant.  She stated that she did not hear the defendant state that the G.D.s were trying to kill him or that he didn't want to kill anyone. 

Defendant testified at trial that he told his mother that he had been shot at while walking home from school, but he never told the police or any school officials about the alleged shootings.
  He testified that he placed the gun outside his home in the garbage the night before taking it to school with him on September 4, 1998.  He stated that he did not carry that gun to school everyday.  Once at school on September 4, 1998, defendant put the gun in his locker. 

As he walked home from school on September 4, 1998, he noticed some boys and girls on the other side of Larrabee, some of whom he knew from high school. Defendant testified that some of the boys in the other group started throwing up gang signs when his group got to the corner of Larrabee and Blackhawk.  His group went down an alley and came out during the walk.  He testified that the boys in the other group came off the curb and came into the street about 5 or 10 feet.  Additionally, he testified as follows:

   "Q. They didn't have anything in their hands, did they?

   A. No.

   Q. You didn't see a gun?

   A. No.

   Q. You didn't see a knife?

   A. No.

   Q. No weapons?

   A. No.

   Q. The young ladies didn't come off of the curb, did they?

   A. No.

   Q. Lakesha Walker didn't come off of the curb, did she?

   A. No.

* * *

   Q. How far away from you were they when you fired at them?

   A. They was about -- it's a distance.

   Q. I'll tell you what, I'll start walking backwards, and you tell me when to stop.  How's that?

   A. All right.  Stop.

   Q. Right here?

   A. Yes.

   Q. So they were about 25 feet?

   MR. JOHNSON [Assistant State's Attorney]: Sure.

* * * 

   Q. Well, you fired at the group, didn't you?

   A. I fired at the group to scare them off.

   Q. We'll get to that.  You fired seven shots right at them, is that right?

   A. Yes.

   Q. And you say to scare them off?

   A. Yes.

   Q. You didn't shoot in the air, did you?

   A. No.

   Q. You didn't shoot over their heads, did you?

   A. No.

   Q. You didn't shoot to the side?

   A. No.

   Q. You didn't say stop, I got a gun, did you?

   A. No.

   Q. In fact, you pointed the gun at them and you shot at the group; isn't that right?

   A. Yes.

* * *

   Q. Fabian states that when they reached Blackhawk, you started to walk east.  And then Fabian states that he turned around and ran back to the corner.  And Fabian states that he pulled out his gun and started to shoot; isn't that what you did? 

   A. Yes.

   Q. You were starting to --

   A. I didn't run.  I didn't run to the corner, and turned around.

   Q. You started to walk east this way, isn't that right?

   A. Yes.

   Q. East is away from where these people were, isn't that right?

   A. Yes.

   Q. And instead of keeping going east, you turned and -- and you came back and shot at them; isn't that right?

   A. I -- when I came back, I saw them running toward me.

* * *  

   Q. And then he gave you a pen, isn't that right?

   A. Yes.

   Q. And he told you to mark where you were and where you went to shoot, isn't that right?

   A. Yes.

   Q. And you put a dotted line from the corner out to the middle of the street, isn't that right?

   A. Probably did.

   Q. Well, did you draw this or didn't you?

   A. Yeah, I drew that.

   Q. Okay.  And then you 'X'd' there indicating where you 

were standing when you were shooting, isn't that right.  

   A. Yes.

   Q. That's not on the corner, is it?

   A. No.

   Q. That puts you in the middle of the street, doesn't it?

   A. Yes.

   Q. So if you were in the middle of the street and the boys were in the middle of the street, you must have been facing each other?

   A. I wasn't in the middle of the street.

   Q. So this is not true?

   A. No. I know I wasn't in the middle of the street.

   Q. So this is not true?

   A. No.

   Q. So you lied to [Detective] Aikin?

   A. Yeah, if that's how you want to put it."

When initially brought to the police station, defendant told a detective that he was in school detention at the time of the shooting.  He also told the detective that he heard that Sedrick Pace shot the victim.  

Defendant tendered second degree murder and involuntary manslaughter instructions.  The judge heard argument regarding the inclusion of second degree murder and involuntary manslaughter instructions.  The requests were denied.

Defendant was found guilty of first degree murder.  Defendant filed a motion for a new trial on October 19, 1999, based on various contentions, including "[t]he Court erred in giving certain jury instructions over the Defendants [
sic
] objection" and "[t]he Court erred in refusing to give certain jury instructions requested by the Defendant."  Defendant's motion for a new trial was denied.  
The trial court sentenced defendant to 45 years' imprisonment.  Defendant appeals.  We affirm.

ANALYSIS

I

Defendant initially contends that the trial court abused its discretion by refusing to tender to the jury second degree murder instructions.  The State responds that the trial court's refusal to tender the second degree murder instructions was not an abuse of discretion because the evidence did not support a theory of self-defense.

Whether to issue a jury instruction is within the province of the trial court, and such a decision will not be reversed unless it is an abuse of discretion.  
People v. Garcia
, 165 Ill. 2d 409, 432, 651 N.E.2d 100 (1995).  If there is evidence that, if believed by the jury, would reduce a crime from first degree murder to some lesser degree of murder, defendant's requested instruction must be given; however, the defendant has the burden of proving that at least "some evidence" exists.  
People v. Toney
, 309 Ill. App. 3d 28, 39, 722 N.E.2d 643 (1999).  

An instructive case is 
People v. Everette
, 141 Ill. 2d 147, 565 N.E.2d 1295 (1990).  In that case, three men, including the victim, were standing in the breezeway of a housing project where Everette, the defendant, lived.  Everette approached his mailbox near the entrance to his building.  In Everette's presence, the victim and his companions referred to an altercation between the victim and Everette that occurred in June 1985, wherein the victim struck Everette on the side of the head with a wine bottle.  
Everette
, 141 Ill. 2d at 152.  The victim and Everette exchanged words regarding the June incident, but Everette retrieved his mail and returned to his apartment without any physical confrontation. 

Everette returned to his mailbox a short time later while the victim and his companions were still in the area.  One of the men testified that he saw Everette pull a black revolver from his pants as he ran toward the men and pointed it at the victim.  
Everette
, 141 Ill. 2d at 152.  The victim turned and began to run away from Everette, but slipped and fell.  

Everette testified that the victim and his companions were gathered in the breezeway and began to taunt him about the June 1985 incident.  
Everette
, 141 Ill. 2d at 153.  After he returned to his apartment from the mailbox, he noticed that he had some misdelivered letters, so he left his apartment to return the letters and took his gun with him.  
Everette
, 141 Ill. 2d at 153.  The victim asked Everette what he was doing back downstairs, and when he turned to answer the victim, Everette noticed what he thought was a beer can in the victim's hand.  
Everette
, 141 Ill. 2d at 153.  Everette testified that the victim's hand was at his waist and angled behind his back in what appellee thought was a striking position.  Everette testified that he thought that the victim was about to hit him.  
Everette
, 141 Ill. 2d at 153.  He took out his gun, cocked the trigger and pointed it at the victim.  As he did so, he took two steps backwards and bumped his shoulder into the mailboxes.  The collision caused him to fire the gun.  He testified that the gun discharged accidentally and that he had only meant to scare the victim with the gun.  
Everette
, 141 Ill. 2d at 154.  In 
Everette
, the court wrote, "Threats alone will not justify the use of deadly force in a killing [citation] ***."  
Everette
, 141 Ill. 2d at 161.  In 
Everette
, the Illinois Supreme Court held that the trial court's refusal to tender the jury instructions of self-defense was correct.  
Everette
, 141 Ill. 2d at 157. 

Another instructive case is 
People v. King
, 293 Ill. App. 3d 739, 688 N.E.2d 825 (1997).  In that case, King, 
the defendant, was a 16-year-old who was asked to "go take care of business" for an associate.  The associate drove King down an alley and pointed out the group of people on a porch that he wanted King to shoot.  
King
, 293 Ill. App. 3d at 741.  King exited the car and began walking down the alley.  As King was walking down the alley, he saw one of the people in the group on the porch "reaching" as if for a weapon.  
King
, 293 Ill. App. 3d at 741.  The reaching motion caused King to pull out his gun and fire six shots in the direction of the porch.  
King
, 293 Ill. App. 3d at 741.  In the instant case, defendant claimed that he felt threatened when the group of boys allegedly crossed the street and came toward him, so he pulled out his gun and fired seven shots in the direction of the group. 
 Similar to the defendant in 
King
, defendant in the instant case did not see a gun in the hands of anyone in the group at which he fired.  The court in 
King
 held that the trial court had properly declined to instruct the jury on second degree murder.  
King
, 293 Ill. App. 3d at 743.   

The Criminal Code of 1961 provides that a person commits second degree murder when "[a]t the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed."  720 ILCS 5/9-2(a)(1) (West 1998).  The defendant must be acting under a sudden and intense passion spurred from serious provocation that the law recognizes as reasonable.  
Garcia
, 165 Ill. 2d at 429.  "The only categories of provocation recognized by [the Illinois Supreme Court] are substantial physical injury or substantial physical assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse."  
Garcia
, 165 Ill. 2d at 429.

Defendant here relies on 
People v. Toney
, 309 Ill. App. 3d 28, 722 N.E.2d 643 (1999), to support his contention that the trial court abused its discretion by refusing to tender to the jury second degree murder instructions.  We conclude that his reliance is misplaced.  In 
Toney
, while defendant Donald Toney was driving his car, rival gang members yelled gang-related threats him.  The rival gang members then threw a bottle at Toney's vehicle and fired shots at him and his two passengers.  Toney's passengers then shot at the other vehicle.  
Toney
, 309 Ill. App. 3d at 32.  One of the rival gang members was killed.  Although all witnesses stated that Toney remained in the car while his passengers fired their guns at their opposers, Toney was found guilty of first degree murder, attempted murder, and aggravated discharge of a firearm.  
Toney
, 309 Ill. App. 3d at 33.  Because of the "competing theories factually at issue,"
 the trial judge held that Toney was entitled to an instruction on self-defense since that instruction was supported by the evidence.  
Toney
, 309 Ill. App. 3d at 42.  

One of the issues upon appeal in 
Toney
 was whether the trial court erred by failing to instruct the jury on the charged offense of intentional and knowing first degree murder and on the mitigating offense of second degree murder.  
Toney
, 309 Ill. App. 3d at 32.  The appellate court reasoned that when the evidence supports giving the jury an instruction on the justifiable use of force in self-defense, then an instruction for second degree murder should likewise be given.  
Toney
, 309 Ill. App. 3d at 43.  The appellate
 court based its holding on the recent history of violence between the rival gangs, the previous confrontation between Toney and two men in the opposing vehicle four days prior to the shooting (which was corroborated by police and an ambulance coming to the scene), the trial testimony of Toney and other witnesses, and the firearm evidence.  
Toney
, 309 Ill. App. 3d at 43.  Unlike the instant case, Toney presented testimony that he believed he was in imminent danger, which was corroborated by witnesses and firearm evidence that persons other than Toney's passengers were firing weapons.  
Toney
, 309 Ill. App. 3d at 41.  Importantly, Toney did not start the shooting, and when he heard shots fired, he drove away from the scene.  
Toney
, 309 Ill. App. 3d at 41.  Additionally, unlike the instant case, Toney's assertion that he had been shot at by rival gang members only days before the shooting was corroborated by police and ambulance reports.

In the instant case, there was no evidence of physical contact between defendant and the victim's group on the afternoon of the shooting or at any time prior.  Defendant states that he "took the G.D.s' threats, taunts, disrespect, and intimidation for blocks without retaliating, and only did so when the G.D.s started coming towards him."  While defendant testified that the G.D.s started coming toward him, defendant's statement to police provided, in pertinent part:  "Fabian states when they reached Blackhawk, he started to walk east.  Fabian states he then turned around and ran back to the corner.  Fabian states he then pulled out the gun.  Fabian states he pointed the gun at the group and then fired seven (7) shots."  No testimony was given that anyone in the other group either possessed a gun or was threatening the use of a gun on this occasion.  In our view, defendant's statements negate the existence of serious provocation.  See 
Garcia
, 165 Ill. 2d at 429.  Threats alone will not justify use of force in a killing, especially where the threats are made by someone other than the victim.  
Everette
, 141 Ill. 2d at 161.  We hold that the trial court did not err in denying  defendant's request for a second degree murder instruction.

II

Defendant also contends that the trial court abused its discretion by refusing to present the involuntary manslaughter instructions tendered by the defendant.  The State counters that the trial court did not abuse its discretion because the evidence did not support defendant's contention that he merely acted recklessly.  

An instruction is justified on a lesser offense where there is some evidence to support the giving of the instruction.  
People v. Jones
, 175 Ill. 2d 126, 132, 676 N.E.2d 646 (1997).  An involuntary manslaughter instruction is not warranted where the evidence reveals that the defendant voluntarily and willfully commits an act that has the natural tendency to cause death or great bodily harm, as such acts demonstrate an intent to kill or injure the victim.  
People v. Foster
, 119 Ill. 2d 69, 87-88, 518 N.E.2d 82 (1987).

The basic difference between involuntary manslaughter and first degree murder is the mental state that accompanies the conduct resulting in the victim's death.  
People v. DiVincenzo
, 183 Ill. 2d 239, 249, 700 N.E.2d 981 (1998).
  A defendant commits first degree murder when he kills an individual without lawful justification and he knows that his acts create a strong probability of death or great bodily harm.  720 ILCS 5/9-1(a)(2) (West 1998).  In contrast, a defendant commits involuntary manslaughter when he performs acts that are likely to cause death or great bodily harm to another and he performs these acts recklessly.  720 ILCS 5/9-3(a) (West 1998).  Accordingly, involuntary manslaughter requires a less culpable mental state than first degree murder.  
DiVincenzo
, 183 Ill. 2d at 249.  

In general, a defendant acts recklessly, when he is aware that his conduct might result in death or great bodily harm, although that result is not substantially certain to occur.  
DiVincenzo
, 183 Ill. 2d at 249.  The statute provides:  

   "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."  720 ILCS 5/4-6 (West 1998).

While a defendant is entitled to an involuntary manslaughter instruction if there is "slight" evidence upon which a given theory could be based, there must be some evidence of the reckless conduct.  
People v. Trotter
, 178 Ill. App. 3d 292, 298, 533 N.E.2d 89 (1988).  Certain factors may suggest whether a defendant acted recklessly and whether an involuntary manslaughter instruction is appropriate:  disparity in size and strength between the defendant and the victim, the severity of the victim's injuries, whether the defendant used his bare fists or a weapon, whether there were multiple wounds, or whether the victim was defenseless.  
DiVincenzo
, 183 Ill. 2d at 251.

While some courts have speculated that where the defendant is shooting "aimlessly" at no one and shoots someone by accident, that situation might be sufficient for an instruction on involuntary manslaughter (see 
People v. Fuller
, 292 Ill. App. 3d 651, 668, 686 N.E.2d 6 (1997)), the evidence in the instant case established that defendant pointed the gun at the group and fired seven times.

Defendant's testimony that he did not intend to kill anyone was insufficient to create a jury question on the issue of recklessness.  The female victim who was shot in the back was not targeted specifically.  However, defendant's statements establish that the group was targeted.  His statement to the police is written as follows:  "Fabian states when they reached Blackhawk, he started to walk east.  Fabian states he then turned around and ran back to the corner.  Fabian states he then pulled out the gun.  Fabian states he pointed the gun at the group and then fired seven (7) shots." Also, in his testimony at trial, he testified that he did not shoot in the air, the gun was pointed at the group and he shot at the group seven times.   Illinois courts have consistently held that when the defendant intends to fire a gun, points it in the general direction of his or her intended victim, and shoots, such conduct is not reckless, regardless of the defendant's assertion that he or she did not intend to kill anyone.  
People v. Jefferson
, 260 Ill. App. 3d 895, 912, 631 N.E.2d 1374 (1994). 

For the foregoing reasons, we hold that the trial court did not err in denying defendant's request for an involuntary manslaughter instruction.  Defendant's first degree murder conviction is affirmed.  Also, the State's request for fees in the amount of $100 for defending this appeal is granted.  See 55 ILCS 5/4-2002.1 (West 1998).

The judgment of the trial court is affirmed.

Affirmed.

GORDON and McBRIDE, JJ., concur.