2021 IL App (1st) 190408-U

No. 1-19-0408

Order filed April 6, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 15605 |
| | ) | |
| JOSE MARTINEZ, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion in declining to issue a jury instruction on involuntary manslaughter.

¶ 2    Following a jury trial, defendant Jose Martinez was convicted of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West Supp. 2009)) and sentenced to 40 years' imprisonment. On appeal, defendant argues that the trial court erred in not instructing the jury on involuntary manslaughter because there was some evidence that he acted recklessly rather than intentionally. We affirm.

¶ 3    Defendant was charged by indictment with two counts of first degree murder. Count I charged defendant with intentionally or knowingly strangling and killing Bozena Staggs with his hands (720 ILCS 5/9-1(a)(1) (West Supp. 2009)), and count II charged defendant with strangling and killing Staggs knowing that the act created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West Supp. 2009)). Prior to trial, defendant filed a notice of alibi defense, providing that he was driving his then-wife to work at the time of Staggs's death.

¶ 4    At trial, Daniel Kobylanski testified that he was Staggs's brother. Around Thanksgiving in 2010, Staggs abused crack cocaine and worked as a prostitute.

¶ 5    David Mathews testified that he walked his dog down an alley near West Homer Street and Kedzie Avenue, in Chicago, around 7:30 a.m. on Saturday, November 27, 2010. Mathews saw a body in the alley, and approached to see if the person was breathing; she was not, and Mathews did not touch her. Her pants were around her ankles, her neck was discolored, and her eyes were open. Mathews went home and called 911. An ambulance arrived, which he directed to the alley. He then spoke to the police. Mathews identified People's Exhibit No. 4 as a photograph of the body in the alley. The photograph, which is included in the record on appeal, depicts the alley, with Staggs's body lying in the middle of the photograph, evidence markers, and crime scene tape. Ice is visible towards the left of the photograph.

¶ 6    On cross-examination, Mathews testified that the body was a few minutes' walk from his home. Mathews did not remember the temperature, but stated it was cold. Defense counsel showed Mathews People's Exhibit No. 4 and asked if he saw ice in the alley. Mathews responded "[p]ossibly here," and defense counsel noted that Mathews pointed to the middle left of the photograph.

¶ 7      Chicago police officer Donna Tarala testified that she and her partner were dispatched to the 3100 block of Homer and arrived at 7:40 a.m. Tarala observed a deceased woman lying in the alley with her pants down. Tarala spoke with Mathews, and she and her partner generated a report, notified their supervisor, detectives, and the medical examiner's office, and guarded the scene.

¶ 8      Chicago police detective John Valkner testified that he arrived at the alley between 8:15 and 9 a.m. The body had already been pronounced deceased via telemetry and covered with a blanket. Valkner inspected the scene while another detective interviewed Mathews. The temperature was in the upper twenties and there was ice on the ground.

¶ 9      Valkner observed bruises and redness around the front of the woman's neck and behind her right ear. She wore a green long-sleeved shirt under a tan T-shirt, her jeans and underwear were down to her knees, and she wore dirty socks without shoes. There were no shoes or jackets in the area. The woman had long, natural, intact fingernails, and forensic investigators placed bags or protectors over her hands to protect any evidence potentially under her nails. Valkner turned the woman over and observed lividity—a purplish internal pooling of blood—on the back of her midsection and buttocks, and gravel stuck to her body. Valkner identified crime scene photographs, some of which he agreed showed the injuries he described, lividity, and gravel pressed or embedded in her body. Valkner confirmed that ice was depicted in People's Exhibit Nos. 4 and 6, another photograph, from a different angle, of Staggs's body in the alley. Ice is visible towards the upper left corner of People's Exhibit No. 6.

¶ 10     On cross-examination, Valkner testified that no jacket, shoes, purse, phone, keys, hat, or other personal items were recovered. The woman was not wearing a bra.

¶ 11    Dr. Michael Eckhardt, an assistant Cook County medical examiner, testified that he did not autopsy Staggs's body, but reviewed the case file and photographs after the pathologist who performed the autopsy left the office. Staggs's body was examined at 8 a.m. on November 28, 2010, almost a full day after it was brought to the office.

¶ 12    When Staggs's body arrived at the office, she was unclothed from the waist down. Staggs's rigidity, or rigor mortis, and lividity were fixed, which generally take 8 to 12 hours or 6 to 12 hours, respectively, but Eckhardt confirmed both may appear in as little as 30 minutes.

¶ 13    Staggs had petechiae, or small hemorrhages, in blood vessels in her eyes and eyelids, which occur when blood rises but cannot return down because the venous system is occluded by force. Erythematous patches on her neck indicated force had been applied there, and Eckhardt stated that, had Staggs lived, the patches may have become a contusion or abrasion. Staggs also had a superficial scratch on her left forehead, an abrasion to her left temple, and two contusions on her left chin, all of which denoted force. Further, there was a contusion on her left distal lateral arm, an abrasion on her medial left elbow, a horizontal abrasion on her right dorsal ring finger, a contusion on her right anterior leg, and an abrasion on her left knee. Internally, there was hemorrhaging in the muscles and cartilage in Staggs's neck, indicating that applied force burst the blood vessel within the muscle. Staggs's toxicology report was positive for cocaine. Eckhardt determined that Staggs died by homicide strangulation. Eckhardt identified People's Exhibit Nos. 20 through 28 as the photographs he reviewed, which depicted the injuries described. Clippings of Staggs's fingernails, samples of her hair, and vaginal and rectal swabs were collected and sealed.

¶ 14    Eckhardt explained that strangulation is the constriction of blood vessels in the neck, which causes loss of consciousness and then death. On average, a person loses consciousness after being

strangled for 5 to 11 seconds. Death will occur in minutes. Eckhardt confirmed that, once a person loses consciousness, continued force is necessary to cause death; if the strangulating force is removed, the unconscious person will not die because the blood vessels are open again.

¶ 15    On cross-examination, Eckhardt testified that death by strangulation may not occur until continuous pressure has been applied for up to five minutes. Rigor mortis can set in quicker if the decedent is in an excited state, or slower in cold temperatures. The rigor mortis process is not immediately observable. The time of Staggs's death was not estimated. The abrasion to Staggs's forehead and the contusions were evidence of blunt trauma.

¶ 16    No medical examiner went to the scene where Staggs's body was found on November 27, 2010, although general protocol is for a body not to be disturbed until a medical examiner arrives. Although he did not receive the report, Eckhardt identified a Chicago Fire Department report of the state of the body at the crime scene, showing that paramedics arrived at 7:37 a.m. and performed the telemetry at 7:42 a.m. The report further noted, *inter alia*, that lividity and rigor mortis were present, Staggs was unresponsive and not breathing, and her airway was not obstructed by any material.

¶ 17    On redirect examination, Eckhardt agreed that without personally seeing the body on the scene, he could not determine how long it took for rigor mortis to set in. At the medical examiner's office, bodies are refrigerated until autopsy, which complicates determining the time of death.

¶ 18    On recross examination, Eckhardt confirmed that refrigeration is used to keep the body as close to its state at the time of death as possible and that paramedics must consult with a physician to have someone declared dead, which they did for Staggs.

¶ 19 Rufus Burks Jr. testified that he dated Staggs for nearly six years preceding November 2010 and they had a child together. Burks confirmed that, in November 2010, Staggs used cocaine and sold sex for money.

¶ 20 On November 26, 2010, Burks worked an afternoon and night shift at a pizzeria until 2 a.m. and arrived home around 3 a.m. on November 27. Staggs was there, but left within an hour. Staggs then returned but left a second time. When Staggs returned a second time, Burks was asleep, but he woke when she brushed against the bed. Staggs left a third time as Burks fell back asleep, around 5 or 6 a.m.

¶ 21 Burks awoke around 10 or 11 a.m. He called and texted Staggs but did not reach her, and worked the same shift at the pizzeria. He never heard from Staggs, and continued to contact her cell phone when he was able. It was not unusual for Staggs to leave for extended periods, but Burks was usually able to contact her through her cell phone. Burks worked again on November 28, 2010.

¶ 22 While Burks was at work on November 28, 2010, police detectives arrived and informed him that Staggs had died. On November 30, Burks went to the police station, was interviewed, and agreed to submit a DNA sample. Burks told the detectives that Staggs used his phone to contact clients "a couple of times."

¶ 23 On cross-examination, Burks testified that he and Staggs argued the last time he saw her. When Staggs left after Burks arrived home in the early morning of November 27, 2010, he assumed she was leaving to work as a prostitute. Burks did not know if Staggs was dressed the final time she left because he was half-asleep. When asked whether Staggs was sometimes picked up by men on the street, Burks responded, "That's an assumption, yes."

¶ 24 Defense counsel asked Burks if he had called Staggs approximately 40 times on November 27 and 28, 2010, and Burks responded that he was not sure. Burks normally worked evenings, but arrived at work around 10 a.m. on November 28. The detectives arrived around 11 a.m. or noon. Defense counsel asked if, when the detectives informed Burks that Staggs had been found dead, Burks asked if she had been found in an alley; Burks noted it had been nearly 10 years since then, but was "pretty sure" his response to the detectives was to ask where she had been found.

¶ 25 Burks gave the detectives Staggs's cell phone number and showed them the phone numbers of the clients Staggs had contacted through his phone. Burks worked the remainder of his shift and arranged to go to the police station on November 29, 2010, but did not do so, and went the following day. Burks continued to call Staggs after he learned she was dead out of doubt or disbelief.

¶ 26 Burks did not recall telling detectives at the police station on November 30, 2010, that he had seen on television or the Internet how Staggs's body was found in the alley or stating that he did not know if she had been left like that to make it appear she had been raped. Burks did not recall seeing Staggs's clients or describing two of them to the detectives. Burks denied telling the detectives Staggs left for the last time after 6 a.m. on November 27, stating that he told them it was around 5 or 6 a.m.

¶ 27 On redirect examination, Burks clarified that he argued with Staggs on the morning of November 26, 2010, but last saw Staggs when he briefly awoke after she bumped the bed around 5 or 6 a.m. on November 27. Burks did not know if she was wearing clean clothes at that time. Prior to going to the police station on November 30, he had seen something on the Internet or television which may have involved Staggs's death, but did not recall what that was. About 30 of

the approximately 40 phone calls Burks made to Staggs happened after the morning of November 27, through the beginning of his shift on November 28.

¶ 28    On recross examination, Burks agreed that he did not see what Staggs was wearing when she left on November 27, 2010. Burks did not recall whether Staggs normally wore a coat. Burks never called the police because it was not unusual for her to be gone for extended periods, although he could usually contact her.

¶ 29    Chicago police detective Ruben Weber testified that he received Staggs's name from the medical examiner's office after her body was examined the morning of November 28, 2010. The medical examiner's office reported that Staggs died by homicide strangulation. Weber and a partner went to the pizzeria where Burks worked, informed him that Staggs had died, and questioned him. Burks agreed to go to the police station and provide a DNA sample the next day, November 29. Burks did not go to the police station on November 29, but went on November 30, when he provided a buccal swab DNA sample.

¶ 30    Weber learned from Burks and Staggs's family what she did for money. Staggs's cell phone had not been located. Weber received her phone number, subpoenaed the phone company for her call logs, and attempted to contact every person who had contacted Staggs around the time of her murder. Many men went to the police station for interviews and provided DNA samples. No evidence connected the men to the crime scene or Staggs's death, and Weber ran out of leads in April 2011.

¶ 31    The case went cold until June 2013, when Weber learned that defendant's DNA was associated with DNA found under Staggs's right fingernails. Weber met defendant, whom he

identified in court, at the police station on July 15, 2013. Defendant consented to provide a DNA sample.

¶ 32    On cross-examination, Weber confirmed that he did not visit the scene on November 27, 2010, because he was assigned to the case the next day. Weber confirmed that, when he told Burks that Staggs had died, Burks asked if she had been found in an alley, and at the police station on November 30, Burks stated that he did not know if the person who killed Staggs attempted to make it appear she had been raped.

¶ 33    On redirect examination, Weber stated that, before Burks stated he did not know whether Staggs had been left in a way to make the police believe she was raped, Burks indicated to Weber that he had learned how Staggs's body was found on the Internet.

¶ 34    Veronica Jackson, a forensic scientist with the Illinois State Police, testified as an expert in forensic biology. Jackson collected cellular material from underneath fragments of Staggs's fingernails and preserved it, along with a sample of Staggs's blood and DNA samples Weber collected, for future DNA analysis.

¶ 35    The State entered several stipulations. First, an evidence technician would testify that he collected a buccal swab from defendant and the swab was submitted for DNA analysis. Second, a Chicago police officer would testify that he collected Staggs's clothing, fingernail clippings, swabs, and blood card from the medical examiner's office and transported them to the police department's forensic services division. Third, a forensic scientist would testify that she received and preserved one of the buccal swab standards collected by Weber. Fourth, a different forensic scientist would testify that she conducted DNA analysis on Staggs's blood sample, some of the buccal swabs collected by Weber, and the material collected from under Staggs's fingernails, and

found a partial male DNA profile from that material. The men whose buccal swabs the scientist analyzed, including Burks, were excluded as possible donors of the male DNA profile. Lastly, a different forensic scientist would testify that, in May 2013, a DNA database detected an association between the partial male DNA profile identified from Staggs's right-hand fingernails and defendant, and the scientist requested an additional standard from defendant for confirmatory analysis.

¶ 36    Cynara Anderson, a forensic science administrator with the Illinois State Police, testified as an expert in forensic DNA analysis. Anderson compared the DNA data generated from the material under Staggs's fingernails with a standard collected from defendant, and determined that defendant could not be excluded from contributing to a mixture of DNA found under Staggs's fingernails. Approximately 1 in 448 billion black, 1 in 270 billion white, and 1 in 11 billion Hispanic individuals could not be excluded from contributing to the DNA profile identified in the sample from the fingernails on Staggs's right hand. Approximately 1 in 8 black, 1 in 17 white, or 1 in 3 Hispanic individuals could not be excluded from contributing to the sample from Staggs's left hand. Anderson explained that the profile from the left hand was more common because more DNA information was present in the sample from Staggs's right hand. On cross-examination, Anderson confirmed that DNA analysis does not show the DNA's age.

¶ 37    Detective Jacinto Gonzalez testified that, on November 27, 2010, he assisted Valkner in the alley where Staggs was found. Two and a half years later, Gonzalez learned from Weber that a DNA association had been made between Staggs's fingernails and defendant.

¶ 38    At the police station on July 15, 2013, Gonzalez and Weber interviewed defendant, whom Gonzalez identified in court. The entire interview, which lasted over an hour, was videotaped, and

the video is in the record on appeal. They did not tell defendant why he was at the police station prior to the interview. Gonzalez described portions of the interview and corresponding video clips were played for the jury.

¶ 39    In the video, Gonzalez advises defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and defendant indicates he understands each right. Defendant denies knowing why he is at the station, and the detectives state that his name arose in an investigation from November 27, 2010. Weber asks if Staggs's name is familiar to defendant and shows him a picture, and defendant denies recognizing her name and states he has never seen her. Weber states that Staggs is a prostitute. Defendant denies having sex with her, but discusses another prostitute he had sex with one time following a fight with his wife, two years prior to the interview. Defendant also discusses his history of anger issues, stating he gets mad quickly. Defendant again denies ever seeing Staggs and states he has no idea why somebody would associate him with Staggs in November 2010. Weber shows defendant two additional photos of Staggs and defendant again denies recognizing her.

¶ 40    However, after first stating that he "might" have seen her before, defendant then states that at least two years earlier, in the summertime, he once saw Staggs on the street near Armitage Avenue and Sacramento Avenue or Humboldt Boulevard. She asked him for a cigarette, and he gave her one. Weber informs defendant that Staggs was found dead on November 27, 2010, near the area he stated he gave her a cigarette, and later states that the detectives had indisputable evidence defendant was with Staggs on that date.

¶ 41    Defendant ultimately admits that he had sex with Staggs three times. Each time, he picked her up from Armitage and Sacramento. Defendant and Staggs never exchanged names or phone

numbers. The third occasion was sometime in August and not on November 27, 2010. Staggs instructed him to pull into an alley. After they had sex in the backseat, defendant paid her and was about to enter the front seat of the vehicle, when they argued because Staggs wanted more money. The first two times, defendant paid her $25, but the third time he only paid her $20. Staggs scratched defendant, who pushed her with the door to his vehicle and may have punched her. Defendant then entered the vehicle and left. Staggs had fallen, but was getting up when defendant left. Weber asks if defendant choked her and defendant replies, "No, sir."

¶ 42    Defendant then admits that Staggs had not gotten up when he left, that he did not know he had hurt her, and thought she was alive. Staggs scratched his back, head, and face. Gonzalez states that defendant held Staggs down, and motions slightly with his hands. Defendant confirms that he grabbed her and demonstrates a choking motion with his hands. Gonzalez performs the same gesture, which defendant repeats while stating he grabbed Staggs and she stopped moving. He thought she fainted, and he left in his vehicle. He repeats that he did not think he hurt her and states he is sorry. Defendant states he did not use all his strength and makes a choking motion again. Gonzalez asks if it was "a rage thing" and whether defendant "snapped," and defendant agrees. He then states he is pretty sure the incident occurred on November 27, 2010, because November 26 is his daughter's birthday. The fight occurred around midnight. Defendant agrees that he gave the detectives the absolute truth.

¶ 43    Everyone stands, and defendant states he does not remember whether he punched Staggs or hit her with the vehicle door. She hit a garage and then fell. Defendant states "that's when I," and kneels, makes a choking motion, and says he did that until Staggs stopped moving. Defendant states he did not know he killed Staggs and thought she fainted or entered a coma, because of how

she felt. When asked if she felt "lifeless," defendant agrees, stating that she moved slightly and he jumped on her and grabbed her; defendant again makes a choking motion and states that Staggs stopped moving. Defendant repeats that he is pretty sure he did not use all his strength. The next morning, defendant told his wife that scratches he had sustained were from boxes falling on him at work.

¶ 44    Gonzalez further testified that the location from which defendant stated he picked up Staggs was approximately five blocks from where Staggs's body was found. No one had told defendant that Staggs was killed by strangulation, another person's DNA had been found under her fingernails, or that her body was found in an alley. After the interview, defendant consented to give a buccal swab DNA sample. Gonzalez confirmed that the timestamp on the video was accurate and defendant was taken to the hospital for a diabetes pill shortly after 6 p.m.

¶ 45    On cross-examination, Gonzalez agreed that the first time anyone mentioned choking was when Weber asked defendant if he had choked Staggs. Gonzalez confirmed that he motioned in front of his body before defendant made a choking motion, but that defendant made that motion previously, when he stated that he pushed Staggs. The clip was played again.

¶ 46    Gonzalez confirmed that he and Weber told defendant they knew he was with Staggs on the date she died and that he had been seen with her, but that was a lie because the conclusion was based on DNA evidence which did not actually establish he was with her on that date.

¶ 47    The defense called Nathan Tomlinson, who testified that he lived on the 3100 block of Homer and let his dog out between 5 and 5:15 a.m. on November 27, 2010. Tomlinson did not hear anything or see anybody in the alley. Although his view of the alley was obstructed, his dog would have alerted him to anyone in the alley. Tomlinson saw Staggs's body "[in] the morning

when the detectives woke me up and ordered me to it." There was a streetlight approximately 20 feet from Staggs's body.

¶ 48    On cross-examination, Tomlinson testified that he likely stayed in his doorway and let his dog into his fenced backyard. Tomlinson agreed he did not pay attention to the alley. On redirect examination, Tomlinson confirmed that the body was found in the alley between his and his neighbor's properties.

¶ 49    Alexander Caraballo, an ambulance commander with the Chicago Fire Department, testified that around 7:32 a.m. on November 27, 2010, he and a partner were dispatched to the 3100 block of Homer for an unresponsive person. Caraballo arrived to the alley and noticed a woman on her back, with her pants around her ankles. Caraballo checked for signs of rigor mortis and lividity, which generally set in after a couple of hours and 20 minutes, respectively. However, Caraballo explained that the timing of rigor mortis was not specified in his training and that every individual might differ. Caraballo reported the situation to a hospital, after which the woman was pronounced dead, and he had no more contact with the body.

¶ 50    On cross-examination, Caraballo stated that he remembered the case despite that it was eight years prior because of the "shocking" position of the body. Caraballo confirmed that his testimony regarding how he examined the body was "basically" an explanation of what he had been trained to do. The woman's pupils were dilated, which could happen immediately upon death, but Caraballo agreed that he did not have the training of a medical examiner to determine time of death or when rigor mortis or lividity would set in. Caraballo agreed that his focus is to determine whether a patient can be resuscitated and he found no signs of life. A doctor at a hospital pronounced Staggs dead after Caraballo relayed her negative vital signs via telemetry.

¶ 51    Susana Sanchez testified that she was married to defendant for nearly 10 years, but they were divorced at the time of trial. Their oldest daughter, whose birthday was November 26, had died, and every year on that date the family would visit her grave, unless they had to work, in which case they would go later or on another day.

¶ 52    Sanchez worked on November 27, 2010, and defendant always drove her. Sanchez's place of employment had offices in East Dundee, Elgin, Arlington Heights, and Elk Grove Village, but Sanchez mostly worked in East Dundee.[1] She and defendant would wake around 5:30 a.m., and the drive from their home on the 2700 block of West Melrose Street, in Chicago, took 1½ to 2½ hours, depending on traffic. Defendant was always home when Sanchez awoke. Sanchez recalled seeing scratches on defendant once, but did not remember when.

¶ 53    On cross-examination, Sanchez testified that she and defendant stopped at McDonald's for breakfast every day while he drove her to work. She worked on November 26, 2010. She did not recall if they went to the cemetery that day. Sanchez did not recall whether defendant was present when she awoke on November 27, but stated that he was always there when she awoke. Sanchez spoke with an investigator on March 1, 2018, but denied stating that she did not remember whether defendant was in bed when she awoke on November 27, 2010.

¶ 54    The scratches Sanchez once saw on defendant were on his upper arm. The State and the court noted that Sanchez pointed to the back of her left shoulder. The scratches resembled paper cuts or box cuts. Sanchez asked where he got them and defendant stated that boxes fell on him at work. Sanchez denied telling the investigator that they resembled fingernail scratches.

---

[1] In her testimony, Sanchez did not specify where she worked on November 26 or 27, 2010.

¶ 55    On redirect examination, Sanchez identified her work schedule and stated that it showed no record of her working November 26, 2010. On November 27, 2010, she punched in at 7:40 a.m. and punched out at 12:49 p.m.

¶ 56    Defense counsel entered a stipulation that a records custodian for Sanchez's employer would testify that Sanchez worked at the employer's facility in Elgin, Illinois. On November 27, 2010, Sanchez punched in at 7:40 a.m., punched out at 12:49 p.m., and did not clock in again until November 30.

¶ 57    Kevin Foster testified that he worked for the Illinois Tollway. When a person drives through a toll plaza with an I-PASS transponder, the transponder logs the transaction in a database. Foster identified an account history report in defendant's name which showed transactions on November 27, 2010. The report showed that an I-PASS registered to the account went west on Interstate 90 through the Devon Avenue toll plaza at 6:52 a.m., west on Interstate 90 through the Route 25 toll plaza at 7:20 a.m., east on Interstate 90 through the Route 25 toll plaza at 7:44 a.m., and east on Interstate 90 through the River Road toll plaza at 8:06 a.m. The tollway photographs each vehicle and license plate when it passes through a toll plaza, but the images are discarded unless the driver does not pay the toll.

¶ 58    On cross-examination, Foster testified that the tollway data shows only that a certain I-PASS transponder passed through a toll plaza, not a vehicle or person. Foster clarified that when a transponder passes through a toll plaza, a photograph is taken but discarded if there are sufficient funds in the I-PASS account. There were sufficient funds in defendant's account, so no photographs existed of the vehicle which passed through the toll plazas using defendant's transponder on November 27, 2010.

¶ 59    Defendant testified that in 2010, he had worked at UPS for approximately four years. To earn extra money, he and his father retrieved scrap metal. He drove Sanchez to work every day, five or six days a week, and the drive would take 1 to 1½ hours. He then drove back, scrapped, and worked from 6 p.m. until 11 p.m. After work he drove straight home.

¶ 60    Defendant did not work on November 26, 2010, when he and Sanchez went to the cemetery with their daughter and his father and sister. Afterwards, defendant lied to Sanchez and told her he had to work. Defendant drove to Armitage and Sacramento, where he saw Staggs. Staggs was dressed nicely and wore a jean skirt, dress shoes without socks, and a half-length jacket. Defendant told Staggs he only had $20, but Staggs entered his vehicle and told him to drive into an alley around the corner. Defendant had seen Staggs approximately twice before, and paid her $25 on those occasions. Defendant parked near a loading dock in the middle of the alley. There was no light. It was approximately midnight.

¶ 61    Staggs and defendant had sex in the vehicle's backseat. Staggs wore a bra and makeup. Afterwards, they both exited the vehicle, Staggs put on her coat, and defendant paid her with money from his wallet. Defendant had more than $20 in his wallet, and Staggs told him she needed more money and attempted to take his wallet. At one point, Staggs scratched defendant with her nails, and the State and court noted that he indicated below his right ear.

¶ 62    As Staggs grabbed at him, defendant attempted to enter the vehicle. Defendant opened the door and accidentally struck her with it, and Staggs hit the garage door of the loading dock. Defendant confirmed he may also have hit her with his hand or arm, and the court noted that he put his left hand near his chest and swung it backward. Defendant then confirmed he hit her with the back of his arm, but denied punching her. Staggs fell after she hit the garage, and defendant

entered his vehicle to leave. In his mirror, defendant saw Staggs getting up as he drove away. Defendant went home. The next morning, November 27, defendant awoke around 5 a.m. and took Sanchez to work. He went to work that night. He never went back to look for Staggs and did not know what happened to her.

¶ 63 In July 2013, defendant was interrogated by detectives at the police station. He admitted that he was with Staggs on November 27, 2010, but did not know he was accused of killing her and denied believing that he had killed Staggs. Towards the end of the interview, Gonzalez discussed choking, and demonstrated a choking motion which defendant repeated in the interview and in court. The court stated that defendant's hands were outstretched and his thumbs and index fingers were touching. Defendant testified that he demonstrated the choking motion in the interview because he had woken at 4 a.m. that morning, was tired, stressed, wanted to leave, and needed his diabetes medicine, which he received at a hospital after the interview. Defendant denied actually choking Staggs.

¶ 64 On cross-examination, defendant testified that, if traffic was light, it took 30 or 35 minutes to travel from defendant's and Sanchez's home to the first toll plaza. Defendant agreed that he would argue with Sanchez about her refusal to drive, would become angry, and had a short temper. On November 26, 2010, the family arrived home at 4 or 5 p.m. after visiting the cemetery. Defendant denied that he fought with Sanchez that day, but admitted he lied to her that he had to work.

¶ 65 Defendant confirmed that he first met Staggs in the summer of 2010. He was driving and she asked him for a cigarette. He later returned to the area, picked her up, and drove to an alley where they had sex. Defendant paid her $25. He confirmed he did the same thing a couple of

months later, and again on November 26, 2010. On that date, they drove to a different alley. They agreed defendant would pay her $20.

¶ 66    After they had sex, Staggs saw that defendant had more money in his wallet and tried to take his wallet. Defendant turned around and Staggs tried to hold him. Defendant confirmed that Staggs gave him "attitude," but denied being angry. Defendant agreed that he pulled away from Staggs as she grabbed his right shoulder and ear and that she scratched him. The State confirmed for the record that he meant his right shoulder and under his right ear. Staggs stopped when he hit her in the chin with his elbow or the vehicle door as he attempted to enter his vehicle.

¶ 67    Defendant denied choking Staggs but admitted that he told the detectives he got on top of her after she fell and put his hands around her throat. Defendant stated that he "followed" Gonzalez in making the choking gesture after Gonzalez did it first. While defendant kneeled and demonstrated the choking motion, the detective stated he would not get on the ground. Defendant denied kneeling in the alley, and stated he was tired and went along with what the detectives said. Defendant admitted that he told the detectives that Staggs fainted and that he put his hands around Staggs's throat until she entered a coma and did not move, and that the detectives had not told him to say those things, but testified that those statements were not true. Defendant denied putting his hands around Staggs's throat and holding her down until she died.

¶ 68    Defendant agreed that, during the interview, the detectives asked if he wanted food and repeatedly asked if he was okay or needed anything, and that he responded each time that he did not need anything because he was fine. Defendant stated that the time stamp on the video was incorrect and that the interview did not end until after 6 p.m., when he was scheduled to take his diabetes medication, and that he received his medication at a hospital around 7:30 or 8 p.m.

Defendant confirmed that he told the detectives his diabetes was not "that bad" as long as he was careful of what he ate, and he was tired but not hungry or thirsty during the interview.

¶ 69    In rebuttal, the State called Joseph Thomas, an investigator with the State's Attorney's Office. On March 1, 2018, Thomas interviewed Sanchez. Thomas asked if she remembered whether defendant was home when she awoke on November 27, 2010, and Sanchez answered that she was "pretty sure" he was but could not be certain because it had been so long. Thomas also asked if defendant had ever come home with scratches, and Sanchez stated that she once saw scratches on his back which defendant told her were from boxes falling on him at UPS. Sanchez told Thomas that the injuries did not appear as if boxes had fallen on him, and Thomas confirmed that she stated they resembled paper cuts.

¶ 70    Thomas also drove from the 3100 block of Homer to defendant's and Sanchez's address on the 2700 block of Melrose, which was 2.2 miles away and took seven minutes. Thomas then drove from the home to the Devon toll plaza, which was 11.4 miles away and took approximately 14 minutes. Thomas completed the drives on a Saturday around 6:30 a.m. Thomas then returned to the 3100 block of Homer and repeated the drives around 7:30 a.m. The drives took the same amount of time.

¶ 71    On cross-examination, Thomas stated that he began the drive from Homer on the street, not from the alley. Thomas never stopped or picked anyone up.

¶ 72    After an off-the-record informal jury instructions conference, the court heard argument on the record regarding defense counsel's proposed jury instructions concerning involuntary manslaughter. Defense counsel argued that the alibi defense did not preclude involuntary manslaughter instructions, and that defendant's statements in the video confession that he held

Staggs down until she stopped moving and thought she fainted was evidence that defendant acted recklessly rather than knowingly or intentionally. The court denied the involuntary manslaughter instructions, finding no credible evidence of recklessness.

¶ 73     Following closing arguments, the jury found defendant guilty.[2] Defendant filed an amended posttrial motion arguing in relevant part that the court erred in declining to issue jury instructions on involuntary manslaughter. The court denied the motion, and after a hearing, sentenced defendant to 40 years' imprisonment. Defendant's motion to reconsider sentence was denied.

¶ 74     On appeal, defendant argues that the trial court erred in refusing to instruct the jury on involuntary manslaughter where there was evidence he acted recklessly, rather than intentionally or knowingly, in his videotaped statement that he "snapped," choked Staggs in "rage," and did not believe he had killed her.

¶ 75     Whether a defendant is entitled to a jury instruction on a lesser-included offense depends on whether the record contains some evidence which, if believed by the jury, would reduce the crime from the charged offense to a lesser offense. *People v. McDonald*, 2016 IL 118882, ¶ 25. It is not for the trial court to weigh the evidence or assess its credibility when determining whether to issue a lesser-included offense jury instruction, and indeed, the evidence need not be credible. *People v. Himber*, 2020 IL App (1st) 162182, ¶ 30. Where a trial court finds insufficient evidence to issue a requested jury instruction, that determination is reviewed for an abuse of discretion. *McDonald*, 2016 IL 118882, ¶ 42. "[A]n abuse of discretion occurs where the trial court's decision

_____

[2] The jury issued only one verdict, but the electronic docket, half-sheet, and mittimus reflect that defendant was found guilty of both counts and that the two counts were merged.

is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *Id.* ¶ 32.

¶ 76    The difference between involuntary manslaughter and first degree murder lies in the culpable mental state of each offense. *Id.* ¶ 51. As charged in this case, a person commits first degree murder where he commits an act which causes death while intending to kill or do great bodily harm to another, knowing it will cause death, or knowing it creates a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1), (2) (West Supp. 2009). A person acts knowingly when he is consciously aware that the result of his conduct is practically certain to be caused by his conduct. 720 ILCS 5/4-5(b) (West 2010).

¶ 77    Conversely, a person commits involuntary manslaughter where he recklessly commits an act likely to cause death or great bodily harm. *Himber*, 2020 IL App (1st) 162182, ¶ 31; see also 720 ILCS 5/9-3(a) (West 2010). In general, a person acts recklessly where he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, *** and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2010). However, when a defendant intentionally commits an act directed at the victim, such conduct is not reckless and does not warrant an involuntary manslaughter instruction, despite the defendant's claim that he did not intend to kill the victim. See, *e.g.*, *People v. Eason*, 326 Ill. App. 3d 197, 210 (2001) ("Illinois courts have consistently held that when the defendant intends to fire a gun, points it in the general direction of his or her intended victim, and shoots, such conduct is not reckless, regardless of the defendant's assertion that he or she did not intend to kill anyone.").

¶ 78     Factors relevant to whether a defendant acted recklessly and which support an involuntary manslaughter jury instruction include "(1) the disparity of size and strength between the defendant and the victim, (2) the duration of the altercation and the severity of the victim's injuries, (3) whether the defendant used a weapon, (4) whether the defendant inflicted multiple wounds, and (5) whether the victim was defenseless." *McDonald*, 2016 IL 118882, ¶ 52. However, whether an involuntary manslaughter instruction should be issued depends on the facts and circumstances of each case. *Himber*, 2020 IL App (1st) 162182, ¶ 31. Generally, the instruction is not warranted where the nature of the killing demonstrates that the defendant did not act recklessly, as shown by multiple wounds or the victim's defenselessness. *Id.*

¶ 79     We conclude that the trial court did not abuse its discretion in declining to instruct the jury on involuntary manslaughter. Defendant confessed at trial to hitting Staggs with his arm or vehicle door, causing her to fall to the ground. In his videotaped interrogation, he further explains that, while she was on the ground, he jumped on her, and he demonstrates kneeling and performing a choking motion which he did until Staggs stopped moving. He ceased when he thought Staggs had fainted or entered a coma and agrees that she felt "lifeless." He agrees with the detectives that strangling Staggs was a "rage thing" and that he "snapped." He further states that he did not believe he had hurt Staggs and did not use all his strength.

¶ 80     While there is no evidence of the disparity in size between Staggs and defendant or that defendant used a weapon, Eckhardt testified that a person loses consciousness from strangulation after 5 to 11 seconds. Death will not occur unless, after the person loses consciousness, continuous pressure is applied for up to five minutes. Eckhardt further testified that Staggs died of homicide strangulation, blood vessels in her eyes and eyelids had burst because her venous system was

occluded, erythematous patches on her neck indicated the application of force, she had hemorrhages in the muscles and cartilage in her neck, and scratches, abrasions, or contusions to her forehead, temple, chin, arm, elbow, finger, leg, and knee.

¶ 81    Defendant's placing his hands around Staggs's neck and choking her until she died is evidence that he knowingly or intentionally killed her, or committed an act knowing there was a strong probability it would result in her death or great bodily harm. See *People v. Leach*, 405 Ill. App. 3d 297, 311-13 (2010) (finding sufficient evidence of murder and rejecting defendant's argument that he acted recklessly in strangling victim to death with hands where defendant knowingly placed hands on victim's neck and doctor testified that death results only after three to six minutes of continued pressure), *aff'd* 2012 IL 111534 (2012). Defendant's confirmation in his videotaped confession that he "snapped" and it was a "rage thing" is unavailing to show that he did not act intentionally or knowingly where Eckhardt testified that, when a strangled person loses consciousness, they will not die unless continuous pressure is applied for minutes. See *McDonald*, 2016 IL 118882, ¶ 52 (factors to be considered in determining whether defendant acted recklessly include duration of altercation, severity of injuries, and defenselessness of victim); see also *Himber*, 2020 IL App (1st) 162182, ¶ 31 (involuntary manslaughter instruction not warranted where nature of killing, as shown by multiple wounds or defenselessness of victim, shows defendant did not act recklessly). Consequently, even taking as true that defendant "snapped" and acted in a rage, the trial court did not abuse its discretion in declining to issue the requested jury instruction where Eckhardt's testimony established that defendant must have strangled Staggs for minutes while she was unconscious and defenseless.

¶ 82    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 83    Affirmed.